# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

```
_____
                                        )
PAUL E. MORALES,                        )
                                        )
                Plaintiff,              )
                                        )
        v.                              )        Civil Action No. 10-00221 (ABJ)
                                        )
JOSHUA GOTBAUM, Director,               )
Pension Benefit Guaranty Corporation,   )
                                        )
                Defendant.              )
_____ )
```

## MEMORANDUM OPINION AND ORDER

Plaintiff Paul Morales brings this action against Joshua Gotbaum, Director of the Pension

Benefit Guaranty Corporation ("PBGC"), under Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 2000e *et seq*., and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*.,

alleging discrimination, retaliation, hostile work environment, and constructive discharge by his

employer, PBGC.  Defendant has moved to dismiss the amended complaint or, in the alternative,

for summary judgment [Dkt #26].   Defendant contends that the actions identified as

discriminatory in the complaint are not adverse employment actions within the meaning of Title

VII or the Rehabilitation Act; that any alleged discriminatory or retaliatory actions can be

explained by legitimate, nondiscriminatory and nonretaliatory justifications; and that the

circumstances presented by plaintiff do not rise to the level of severity necessary to make out a

hostile work environment claim.  Plaintiff opposes the motion to dismiss, and he has asked the

Court to deny the motion for summary judgment under Federal Rule of Civil Procedure 56(d) to give him the opportunity to conduct discovery.[1]

The complaint is an excruciatingly detailed account of plaintiff's alleged treatment at the hands of his supervisors, and it recounts events that fall everywhere on the spectrum from petty office grievances to potentially actionable adverse employment actions.[2]   Plaintiff's failure to distill the factual presentation to its essence as required by the Federal Rules has had the unintended effect of obscuring rather than strengthening the statement of his claims, and it has made the Court's task considerably more difficult.   But basically, plaintiff alleges that he was discriminated against on the basis of his race, that his employer retaliated against him after he voiced concerns about discrimination in the work place, and that he endured discrimination on the basis of his disability – an emotional disorder occasioned by the stress of dealing with the

---

1       Plaintiff actually invoked Federal Rule of Civil Procedure 56(f), which, prior to 2010, gave the court discretion to deny a motion for summary judgment in order to provide time for discovery.   However, when Congress amended the Federal Rules in 2010, Rule 56(f) was re-codified as Rule 56(d).   The new codification was made "without substantial change."   Fed. R. Civ. P. 56(d), 2010 amend. cmt. (2010); *see also Butler v. Schapiro*, -- F. Supp. 2d --, 2012 WL 928159, at *6 n.2 (Mar. 20, 2012) (stating that the recodification did not change the substance of the rule).

2       The amended complaint is extremely long and unreasonably and unnecessarily detailed. *See, e.g.*, Am. Compl. ¶¶ 39–40 ("Ms. Mathes stood at Mr. Morales' doorway and demanded that he immediately attend the meeting.   Mr. Morales was on the telephone with a customer at that moment, and . . . Ms. Mathes stood across the threshold of his small office with her arms crossed, staring at Mr. Morales. Ms. Mathes was visibly impatient and irritated."); *id.* ¶ 95 ("Mr. Morales perceived Ms. Mathes' demeanor to be angry in that she swept right by him and his co-worker with her head tilted forward and a scowl on her face[.]"); *id.* ¶¶ 219–20 ("Shortly after this initial exchange, Mr. O'Neill burst into Mr. Morales's office without knocking. . . . Mr. Morales was forced to back up his chair due to Mr. O'Neill's invasion of his personal space. Mr. O'Neill's face and hands were tightly clenched, giving the impression that he was prepared to physically attack Mr. Morales.   Mr. O'Neill then turned around suddenly and stormed out of Mr. Morales's office.").
        Plaintiff's counsel would be well-served by a review of Federal Rule of Civil Procedure 8, which calls for a "short and plain statement of the claim showing that the pleader is entitled to relief," and not a short novel.

first two circumstances.  After studying the complaint, the Court concludes that:  (1) plaintiff has made out a claim for retaliation; (2) plaintiff's claims of racial discrimination are extremely thin and conclusory, but they survive defendant's attack on the face of the complaint; (3) plaintiff has failed to allege sufficient facts to support an inference that defendant discriminated against him on the basis of his disability; and (4) plaintiff has failed to allege facts that would support a claim of hostile work environment or constructive discharge on either ground.  For those counts that survive this opinion, the Court is inclined to permit discovery to proceed and address defendant's request for summary disposition after the parties have had the opportunity to develop the record.  Therefore, the Court will grant defendant's motion to dismiss plaintiff's Rehabilitation Act claims as well as his Title VII hostile work environment and constructive discharge claims, and deny it as to plaintiff's Title VII discrimination and retaliation claims.  It will also deny the motion for summary judgment without prejudice under Rule 56(d).

## BACKGROUND

The following facts are taken from plaintiff's Amended Complaint [Dkt. # 23].  Plaintiff is a Hispanic male of Mexican national origin who suffers from "Adjustment Disorder of Adult Life with Severe Anxiety," depression, and Post Traumatic Stress Disorder.[3]  Am. Compl. ¶¶ 2, 87–88.  He was employed by defendant from 2001 to March 2010 as an Accountant in the Financial Operations Department ("FOD") of its Collection and Compliance Division ("CCD") in Washington, D.C., most recently at the GS-13 level.  *Id.* ¶¶ 3, 149.

In May 2007, plaintiff testified in support of Lydia Brown, a fellow employee, in her EEO action against defendant.  Am. Compl. ¶ 22.  Ms. Brown alleged that plaintiff's supervisor,

---

3       Plaintiff alleges that he was first diagnosed with "Adjustment Disorder of Adult Life with Severe Anxiety" on August 20, 2008, and that it was caused by "the volatile work environment at PBGC and the actions of PBGC management."  Am. Compl. ¶ 87.

Ms. Mathes, had discriminated against her on the basis of her race in violation of Title VII. Am. Compl. ¶¶ 22–23. Plaintiff claims that through his testimony, he "corroborated Ms. Brown's complaints that Caucasian/white employees at FOD, CCD were treated more favorably by Ms. Mathes and other management officials to the detriment of those who were not Caucasian/white, and supported Ms. Brown's allegations that Ms. Mathes retaliated against those who complained to management about her discriminatory conduct." *Id.* ¶ 25.

Sometime between April 30 and August 1, 2008, plaintiff again testified in support of Ms. Brown; this time, in the arbitration of an Institutional Grievance filed by the representative union. Am. Compl. ¶¶ 26–30. Several PBGC management officials testified on behalf of Ms. Mathes. *Id.* ¶¶ 34–35, 77.

On May 16, 2008, Ms. Mathes assigned to plaintiff a project on "aged trial balances" ("ATB project"), which plaintiff contends required extensive research, and she gave plaintiff two weeks to complete it. *Id.* ¶¶ 46–47. When plaintiff responded that he would be unable to meet the two-week deadline due to the demands of his workload, Ms. Mathes requested that plaintiff provide her with daily reports on his progress. *Id.* ¶ 50. Several emails were exchanged between plaintiff, Ms. Mathes, and Mr. Kofsky (plaintiff's supervisor subsequent to Ms. Mathes), which plaintiff claims "gave the impression that [plaintiff] was not doing his job." *Id.* ¶ 59. Because the emails were "broadcast by [the Human Resources Department ("HRD")] to all upper management at PBGC," plaintiff states that they "greatly damaged his reputation at PBGC." *Id.*

On August 26, 2008, in response to the allegedly unreasonable project deadline, the daily reporting requirement, and the subsequent emails circulated about these issues, plaintiff filed a formal EEO complaint against Ms. Mathes, alleging that she had retaliated against him for his testimony in support of Ms. Brown's EEO claims. Am. Compl. ¶¶ 61–62. Moreover, he alleged

that "Ms. Mathes treated [plaintiff] and other non Caucasian/white employees differently by demanding shorter deadlines for their work, subjecting them to much greater scrutiny, yelling orders at them, and addressing them in a loud voice replete with condescension." *Id.* ¶ 64.  On May 27, 2008, plaintiff, assisted by his union representative, Ms. Baird, met with HRD and requested that HRD's Harassment Investigation Committee ("HIC") investigate the alleged discriminatory and retaliatory actions of Ms. Mathes. *Id.* ¶¶ 65–66.  The HIC, however, denied plaintiff's request because it allegedly found that "Ms. Mathes' harassment of [plaintiff] did not rise to the level of discrimination" warranting an investigation. *Id.* ¶ 67.

On December 12, 2008, defendant held a meeting, at which plaintiff claims he "voiced his concerns regarding the discriminatory and retaliatory environment at PBGC" and "noted that the CCD had become volatile and that he believed that physical harm might occur." Am. Compl. ¶¶ 92–93.  After the meeting, Ms. Mathes approached one of plaintiff's coworkers, Ms. Bermudez, who had also testified for Ms. Brown, and handed her papers which allegedly criticized her work. *Id.* ¶ 96.  Plaintiff claims Ms. Bermudez subsequently "rushed into Mr. Callahan's office and, within seconds, came back out, crumpled to the ground, crying and repeating that she had thrown the papers at Mr. Callahan," *id.*, and plaintiff had to "hold Ms. Bermudez in an attempt to restrain her." *Id.* ¶¶ 97.  Afterwards, feeling upset and unwell, plaintiff took himself to the hospital emergency room, where he was advised that "he should not return to work until his work induced stress had been assessed by his primary care physician." *Id.* ¶¶ 99–100.

Plaintiff claims that after this incident, he was "treated poorly" by PBGC management and HRD.  Am. Compl. ¶ 101.  Specifically, he claims that he was the victim of the following mistreatment:

- HRD contested plaintiff's workers' compensation claim for injuries sustained during the "altercation with Ms. Bermudez" and "accused [plaintiff] of lying about his physical symptoms following the incident." *Id.* ¶ 106.

- Plaintiff was denied paid leave to follow the doctor's rest order, requiring him to take leave without pay. Even so, his supervisor Mr. Callahan "demanded" that he attend a meeting at the office. Am. Compl. ¶¶ 101–102. He also claims that he "escalated his requests" for a solution to the leave without pay situation in late December of 2008, but received no response. *Id.* ¶ 104.

- Starting in early 2009, Mr. Callahan made several efforts to thwart plaintiff's progress with his EEO complaint. First, on January 15, 2009 and January 22, 2009, Mr. Callahan refused to allow plaintiff's designated EEO representative to assist him, stating that the representative "had too much work to do." Am. Compl. ¶¶ 72, 108–09. Then, in August and November of 2009, plaintiff made requests for official time to review his "EEO documents," which he claims were "immediately denied . . . or approved [for] an insufficient amount of time. *Id.* ¶¶ 111–12.

- Also in early 2009, Mr. Callahan wrongfully denied plaintiff's request for advance sick leave, as well as his request to work from home through the PBGC's Flexiplace program. *Id.* ¶¶ 117–19.

Plaintiff alleges further mistreatment following his involvement in the EEO process, Am. Compl.

¶ 124:

- Plaintiff was denied several training opportunities, as well as the opportunity to work on "high profile assignments." Am. Compl. ¶¶ 126, 129. First, he was "repeatedly" denied Contracting Officer's Technical Representative ("COTR") Training, even though a fellow Caucasian employee, who allegedly lacked seniority, was given COTR Training. *Id.* ¶ 126. Second, in January 2009, plaintiff applied to a USDA Graduate School Leadership Development Graduate Program, and Mr. Callahan rejected his request, "citing budgetary restrictions." *Id.* ¶ 127. As to high-profile assignments, plaintiff claims he was denied the opportunity to work on the Premium and Practitioners System User Acceptance Test Plan, which started in May of 2007 and "was considered one of the highest priorities at PBGC." *Id.* ¶ 129. In addition, he was not asked to assist with the development of collection procedures for terminated plans. *Id.*

- Mr. Callahan changed plaintiff's performance standards without plaintiff's participation, in violation of defendant's performance management system, Am. Compl. ¶ 130, and his work was "criticized and questioned" by his supervisors for no legitimate reason, *see id.* ¶¶ 132–34.

- Plaintiff applied for a GS-14 "Lead Accountant" position, but he was not interviewed even though he was qualified. Mr. Callahan's justification for not interviewing him was that he did not have the "necessary supervisory experience." Am. Compl. ¶¶ 141, 146–149. Plaintiff claims that, per HRD's determination, applicants did not need "formal supervisory experience" to qualify for the position, *id.* ¶ 144, and that, because he was initially determined to be a "best qualified candidate" for the position, he should have been interviewed, *id.* ¶ 145. On August 31, 2009, plaintiff was informed by Mr. Callahan that another candidate, Mr. O'Neill (a white male) from the Smithsonian Institute, had been selected for the position. *Id.* ¶¶ 146–47, 150, 156. Plaintiff claims that he was "clearly more qualified" than Mr. O'Neill, *id.* ¶ 151, because O'Neill did not meet the minimum education requirement for the position, *id.* ¶¶ 153–55.

Plaintiff also states that he suffers from emotional disorders that were triggered and/or exacerbated by the stress he experienced at work, Am. Compl ¶ 87, and those are the grounds for his Rehabilitation Act claims. On January 8, 2009, he contacted HRD to request that he be allowed to work at home as a reasonable accommodation for his disability, and he submitted medical documentation in support of his request. *Id.* ¶¶ 136–37. Plaintiff claims that the request was necessitated "by the continued trauma and stress PBGC management constantly subjected him to," *id.* ¶ 136, and that its purpose was to "remove [plaintiff] from the workplace situation that caused him extreme stress and anxiety and further exacerbated his disabilities," *id.* ¶ 138. HRD granted plaintiff's and allowed him to work from home three days per week, finding that plaintiff was a qualified individual with a disability within the meaning of the Rehabilitation Act. *Id.* ¶ 140.

But plaintiff alleges that defendant resumed assigning him projects with unreasonable deadlines. First, on October 6, 2009, Mr. O'Neill, plaintiff's team lead at the time, assigned plaintiff a difficult "high dollar" credit review project, and established what plaintiff claims was an unreasonable deadline. Am. Compl. ¶¶ 159–64. Next, on November 18, 2009, Mr. Callahan gave plaintiff an assignment to review credit balances and asked him to complete it by the end of

the day.  When plaintiff completed the assignment four days later, Mr. Callahan told him that was unacceptable.  *Id.* ¶¶ 168–71.

Plaintiff claims that during the period that he worked from home, Mr. Callahan and Mr. O'Neill "subjected [his] work to a higher level of scrutiny," by "constantly inquir[ing] into what he was doing" and "requir[ing him] to submit detailed daily reports regarding his work," which onsite employees were not required to do.  *Id.* ¶¶ 172–73.  He avers that he was "constantly subjected to negative commentary and belittling by his supervisors." *Id.* ¶ 178.  For example, he claims that Mr. Callahan sent him "an email that unprofessionally criticized [plaintiff's] work product" by quoting "a passage from an accounting textbook in an attempt to prove that [plaintiff] performed a write-off incorrectly." *Id.* ¶ 175.  Overall, plaintiff claims that Mr. Callahan was "purposefully dissatisfied with [plaintiff's] work in order to . . . gain a basis for issuing [plaintiff] poor performance evaluations." *Id.* ¶ 176.

Meanwhile, plaintiff's performance rating, which he claims had consistently been "excellent," dropped to "meets expectations," and by October 2009, it dropped to "unacceptable."  *Id.* ¶ 181.  He claims that the decline in his performance ratings "began immediately after [he] started filing his own EEO complaints and requesting a reasonable accommodation." *Id.*

Plaintiff claims that starting in October 2009, Mr. Callahan and Mr. O'Neill tried to undermine the accommodation he had received by assigning him matters that supposedly required him to be physically present in the office.  Am. Compl. ¶¶ 183, 185.  HRD's Reasonable Accommodation Coordinator, Ms. Hanmer, offered plaintiff a "windowless room" in a building across the street from defendant's office building so that he could perform the work without actually coming to the CCD office.  *Id.* ¶ 186.

On December 5, 2009, in response to continued "belittl[ing]" and wrongful criticism by Mr. Callahan, plaintiff met with Ms. Hanmer to discuss further accommodations.  *Id.* ¶¶ 190–91. Plaintiff alleges that Ms. Hanmer suggested that he could be moved to an external detail, but then later informed him that she did not consider an external detail to be an appropriate accommodation request.  *Id.* ¶¶ 194–95.  As an alternative, defendant's Special Counsel informed plaintiff that PBGC would approve an external detail if plaintiff would agree to resign six months after the detail started and to withdraw his EEO complaints.  *Id.* ¶¶ 196–97.  Plaintiff rejected the offer.  *Id.*

Ms. Hanmer also authorized plaintiff to take thirty days of leave.  Am. Compl. ¶ 191. When the thirty days expired, plaintiff used advanced sick leave and annual leave for nearly three months "to remove himself from the hostile PBGC work environment that was causing his condition to deteriorate."  *Id.* ¶¶ 200, 202.  Starting February 26, 2010, however, Mr. Callahan allegedly "falsely claimed that [plaintiff] had exhausted his annual leave."  *Id.* ¶ 203.  And on March 15, 2010, due to the disagreements over the extent of plaintiff's remaining leave, plaintiff returned to work, on the three day at home schedule.  Am. Compl. ¶¶ 207–08.

Plaintiff alleges that problems with his supervisors persisted once he was working again. First, he was given another assignment with an allegedly unreasonable deadline.  *Id.* ¶ 210. Second, he requested an accommodation giving him a fourth day at home each week.  *Id.* ¶ 215. The Reasonable Accommodation Coordinator told plaintiff that he would need to provide additional medical documentation for the new request even though plaintiff "had already submitted copious amounts of medical evidence and documentation when applying for his original reasonable accommodation request in 2009."  *Id.* ¶¶ 226–27.  Finally, plaintiff alleges that on March 22, 2010, Mr. O'Neill became "belligerent" towards plaintiff, "claiming [a]

spreadsheet had not been done to his satisfaction," and later, "angrily moved closer" to plaintiff, "giving plaintiff the impression that Mr. O'Neill was prepared to physically attack [him]."  *Id.* ¶¶ 217–20.

Ultimately, plaintiff alleges that the "actions of PBGC management caused [him] so much stress that he was forced to apply for disability retirement."  Am. Compl. ¶ 228.  He went on Leave Without Pay in April 2010, and his disability retirement was granted and became effective on May 1, 2010.  *Id.*  ¶ 231.

Plaintiff filed a complaint in this Court on February 12, 2010 [Dkt. #1] and filed an amended complaint on March 2, 2011 [Dkt #23].  Counts I, II, III, and IV of the amended complaint allege racial discrimination, a racially hostile work environment, retaliation, and constructive discharge, in violation of Title VII.  Counts V, VI, VII, and VIII, asserted under the Rehabilitation Act, allege failure to provide reasonable accommodations, discrimination, on the basis of a disability, hostile work environment, and constructive discharge.  Defendant has moved to dismiss the amended complaint, or in the alternative, for summary judgment under Federal Rules of Civil Procedure 12(b)(6) and 56(a) [Dkt. #26].  Plaintiff subsequently moved for relief under Federal Rule of Civil Procedure 56(d), requesting that the Court deny defendant's motion for summary judgment so that the parties may conduct discovery before briefing dispositive motions beyond the motion to dismiss [Dkt. # 31].

## MOTION TO DISMISS

### I.    Standard of Review

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted); *accord Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  129 S. Ct. at 1949.  And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 1950.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff "the benefit of all inferences that can be derived from the facts alleged."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *See id.*; *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citations omitted).

## I. Analysis

The first four counts in the complaint allege racial discrimination and retaliation in violation of Title VII, and the second four allege mistreatment grounded in plaintiff's disability in violation of the Rehabilitation Act. But because both sets of counts include similar claims – ie., disparate treatment, hostile work environment, and constructive discharge – the Court will address each pair of similar claims, which require proof of similar elements, together.

### A. Plaintiff's Discrimination Claims (Count I and VI)

Counts I and VI of the amended complaint allege respectively that plaintiff was discriminated against on the basis of his race in violation of Title VII, and on the basis of his disability in violation of the Rehabilitation Act. Specifically, the amended complaint alleges first that "PBGC officials treated [plaintiff] in a less favorable manner than Caucasian/white employees in violation of Title VII," Am. Compl. ¶ 235, and second, that "[a]s a result of [his] disability and reasonable accommodation, PBGC officials treated [plaintiff] in a less favorable manner than individuals who worked onsite, and individuals without disabilities," *id.* ¶ 276.

To make out a prima facie claim of discrimination, a plaintiff must show that "(1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination." *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002). But because discovery might lead to direct evidence of discrimination, a plaintiff need not prove a prima facie case at the motion to dismiss stage. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002); *see also Ali v. Dist. of Columbia*, 697 F. Supp. 2d 88, 91 (D.D.C. 2010), citing *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (A Title VII plaintiff "need not set forth the elements of a prima facie case [of discrimination] at the initial pleading stage.") (alteration in original). To survive a motion to

dismiss, the complaint need only allege that the plaintiff "suffered an adverse employment action . . . because of [his] race, color, religion, sex, national origin, . . . or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

There is no dispute that plaintiff is the member of a protected class. Defendant seeks dismissal of plaintiff's discrimination claims on the grounds that plaintiff's "litany of common work place disagreements do not amount to an adverse action" and that plaintiff has failed to demonstrate that the legitimate reasons defendant has proffered for its actions were pretextual. Def.'s Mem. at 5, 11.

    1)  <u>Title VII discrimination claim (Count I)</u>

"Not all personnel decisions with negative consequences for the employee qualify as legally cognizable adverse actions." *Runkle v. Gonzales*, 391 F. Supp. 2d 210, 222 (D.D.C. 2005) (internal quotation marks omitted). Only actions that create "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities" qualify. *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999) *abrogated on other grounds by Steele v. Schafer*, 535 F.3d 689 (D.C. Cir. 2008). Courts require a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits," *Benjamin v. Duncan*, 694 F. Supp. 2d 1, 6 (D.D.C. 2010), quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009), or a "tangible change in the duties or working conditions constituting a material employment disadvantage," *Mack v. Strauss*, 134 F. Supp. 2d 103, 111 (D.D.C. 2001) (internal quotation marks omitted); *see also Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (stating that objectively tangible harm is often in the form of direct economic harm, such as affecting an employee's grade or salary).

Plaintiff points to a number of ways in which he believes he was mistreated,[4] including:

- assignment of work with unreasonable deadlines, Am. Compl. ¶¶ 46–47, 159–65, 168–71;

- excessive supervision by management, *id.* ¶ 50;

- denial of training opportunities and opportunities to work on high-profile projects, *id.* ¶¶ 126–29;

- changed performance standards, *id.* ¶¶ 130–34;

- negative performance evaluations, *id.* ¶ 181.

The amended complaint includes the allegation that these actions caused plaintiff to "experience[] a loss of income and other economic benefits,"[5] Am. Compl. ¶ 239, 278, but it does not provide specific facts that would support that conclusion.  Without plausible allegations of economic harm, courts have found that the sorts of actions alleged by plaintiff, including giving negative performance feedback and denying training opportunities, do not constitute adverse employment actions.  *See, e.g.*, *Brody*, 199 F.3d at 457–58 (noting that "formal criticism

---

4       Plaintiff indicates in subsequent pleadings that certain actions in the "Facts Common to All Counts" were alleged by him not as adverse employment actions, but as "context [for] the Court for the hostile work environment promulgated by management at PBGC," such as defendant's "disparaging remarks about Plaintiff at the arbitration [for the NAGE complaint], submissions to the OWCP [controverting plaintiff's workers' compensation claim], [lack of adequate] investigation into Plaintiff's complaints of harassment, and decisions to deny Plaintiff leave to prepare his EEO case."  Pl's Opp. at 9 n.2.  Thus, these actions will not be addressed here.

5       Plaintiff also alleges that these actions "damaged [his] professional reputation and standing, as well as caused him mental anguish, physical harm, embarrassment, humiliation, and indignity."  Am. Compl. ¶¶ 238, 277.  This Circuit has held that "purely subjective injuries," such as "public humiliation, or loss of reputation" do not constitute the objectively tangible harm necessary to establish adverse employment action under Title VII.  *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (internal quotation marks omitted).  Plaintiff further alleges that the actions caused him "mental anguish [and] physical harm," as well as caused him to "incur[] additional expenses related to medical expenses."  *Id.* ¶¶ 238–39, 277–78.  Such effects are also not actionable, as they are not effects to the "terms, conditions, or privileges of employment."  *Forkkio*, 306 F.3d at 1130 (internal quotation marks omitted).

or poor performance evaluations" typically do not constitute adverse employment actions in the absence of direct economic harm); *Doe v. Roberts*, -- F. Supp. 2d --, 2011 WL 6257234, at *3 (D.D.C. Dec. 14, 2011) ("[T]he denial of a single training or travel opportunity does not constitute an adverse employment action unless the plaintiff can tie the alleged discriminatory action to some actual, tangible adverse employment consequence.") (citation and internal quotation marks omitted).[6]

But the complaint does include at least one allegation with clear adverse economic consequences:  the claim that plaintiff was not selected, and not even interviewed, for the GS-14 accountant position.   Am. Compl. ¶¶ 141–157.   Therefore, notwithstanding the quantity of minutiae in the complaint that does not advance the ball, the Court finds that the complaint contains sufficient facts to satisfy this element for purposes of a motion to dismiss.

Next, the Court must look to whether plaintiff sufficiently alleges that he suffered the adverse employment actions because of his race.  There is little in the amended complaint that would suggest that plaintiff's non-selection – or any other complained-of action – was animated by racial bias.  Instead, plaintiff makes it abundantly clear that the gravamen of the complaint is that plaintiff and others suffered retaliation after their testimony against Ms. Mathes.  *See, e.g.*, Am. Compl. ¶ 37 ("Mr. Morales experienced retaliation from PBGC management and Ms. Mathes as a result of this participation as a witness . . . . Ms. Mathes imposed arbitrary deadlines, wrongfully critiqued his work product, and micromanaged [his] daily activities . . ."); *id.* ¶ 63

---

6       Plaintiff argues that "[e]ven actions by an employer that do not directly affect the finances of the claimant may be considered adverse employment actions, if the acts were done with the purpose of and would cause a reasonable employee to deter from engaging in further protected activity," Pl.'s Opp. at 10, and that adverse employment actions include "all actions that are 'materially adverse' to a reasonable employee," *id.* at 9.  This statement confuses the standard for adverse employment actions in the discrimination context with that of adverse actions in the retaliation context.

("Mr. Morales had been employed by PBGC for over 17 years without incident.  Prior to testifying against Ms. Mathes, Mr. Morales received numerous awards and consistently received exemplary performance appraisals."); *id.* ¶ 64 ("Following their participation in Ms. Brown's EEO claims, Ms. Mathes treated Mr. Morales and other non Caucasian/white employees differently by demanding shorter deadlines for their work, subjecting them to much greater scrutiny, yelling orders at them, and addressing them in a loud voice replete with condescension."); *id.* ¶ 71 ("Ms. Bermudez and Ms. Mathes had an acceptable working relationship until Ms. Bermudez testified in Ms. Brown's EEO case. . . . [The] radically unrealistic [deadline] . . . was meant to harass Ms. Burmudez in retaliation for testifying against Ms. Mathes."); *id.* ¶ 131 ("Mr. Morales had spent over 17 years at PBGC and his work product had not been at issue until he became involved with Ms. Brown's and his own EEO complaints."); *see also* Am. Compl. ¶¶ 48, 51, 53 (ascribing the unprecedented requirement that plaintiff submit daily reports to his participation in the EEO action against Ms. Mathes); and *id.* ¶¶ 67, 70 (attributing HIC's refusal to process Mr. Morales's complaint and Ms. Mathes's treatment of him to his participation in the EEO action against Ms. Mathes).

But the complaint is not entirely devoid of allegations of disparate treatment on the basis of race.  Plaintiff alleges that the Union instituted a grievance alleging that minority employees were subject to discrimination, Am. Compl. ¶ 26; that "Mr. Morales spoke with Ms. Mathes regarding her harassment of him and other minority employees in CCD," *id.* ¶ 56; that it was the "non Caucasian/white" employees who were treated differently after their testimony, *id.* ¶ 64; that "Ms. Mathes was the subject of numerous complaints by non Caucasian/white employees," *id.* ¶ 68; and that Sonia Bermudez (alleged to be Hispanic) and Richard Anderson (African American) were subjected to unreasonable demands and incivility and participated in the EEO

proceedings. *Id.* ¶¶ 53, 69–70.  Plaintiff further alleges that Mr. Anderson "filed a complaint of

his own with HRD regarding discriminatory and retaliatory conduct he experienced at CCD."  *Id.*

¶ 74.  Plaintiff alleges that PBGC management was aware of Ms. Mathes's conduct towards non-

white employees, that the complaints led to the retention of an outside contractor, that based on

the contractor's report, which has yet to be disclosed, sensitivity training sessions were instituted,

and that ultimately, Ms. Mathes was removed from her leadership position. *Id.* ¶¶ 76–86.  In the

end, he summarizes his racial discrimination claim with the conclusory statement that "PBGC

officials treated Mr. Morales in a less favorable manner than Caucasian/white employees." Am.

Compl. ¶ 235.

There is little here that rises to the level of *facts* that would permit a jurist to conclude

that the defendant is liable under the *Iqbal* standard.  Nonetheless, in an abundance of caution,

and giving plaintiff the benefit of all inferences at this stage of the proceedings, the Court will

permit Count I to stand, and it will be up to the plaintiff to amass sufficient evidence to carry his

burden at the summary judgment stage.

Defendant next argues that that it has "legitimate nondiscriminatory . . . reasons for all

the alleged improper acts," and that plaintiff cannot show that these reasons are pretextual.

Def.'s Mem. at 5, 17.  However, at the motion to dismiss stage, a plaintiff is not required to

negate a defendant's proffered explanations for the alleged adverse treatment.  *Rochon v.*

*Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006); *see also Winston v. Clough*, 712 F. Supp. 2d 1,

11 (D.D.C. 2010) ("A plaintiff alleging retaliation faces a low hurdle at the motion to dismiss

stage, and need not present evidence of pretext.").  This issue is only relevant to defendant's

motion for summary judgment, which the Court discusses below.

2)  Rehabilitation Act discrimination claim (Count VI)

Count VI of plaintiff's amended complaint alleges that he suffered adverse actions because of his disability.  There is not one allegation in the amended complaint that supports the conclusion that the adverse actions alleged were directed against plaintiff *because of his disability*.  The only assertion that supports the claim is the conclusory statement set forth in Count VI that "Mr. Morales was subjected to disparate treatment because of his documented disabilities that made it necessary for him to work from home three days per week."  Am. Compl. ¶ 274.  This assertion is insufficient to state a claim under *Iqbal* and *Twombly*, so the Court will dismiss Count VI.

B.  Plaintiff's Hostile Work Environment Claims (Counts II and VII)

Counts II and VII allege that defendant subjected plaintiff to a hostile work environment because of his race in violation of Title VII, Am. Compl. ¶¶ 240–49, and because of his disability in violation of the Rehabilitation Act, *id.* ¶¶ 279–89.  Defendant contends that plaintiff cannot make out a claim for hostile work environment because (1) the alleged "work-related" actions are insufficient to create a hostile work environment; (2) plaintiff fails to allege a link between "insults and ridicule" and his membership in a protected class; and (3) "[p]laintiff's allegations have a lack of severity based on infrequency over a course of time and are of a non-threatening in [sic] nature."  Def.'s Mem. at 36–38.  The Court agrees that the overwhelming majority of the alleged mistreatment is not the sort of conduct that is actionable, and that plaintiff fails to allege a sufficient link between the alleged hostility and his race, as well as between the hostility and his disability, so it will grant defendant's motion to dismiss both counts.

To make out a hostile work environment claim, a plaintiff must demonstrate that the "workplace is permeated with discriminatory intimidation, ridicule, and insult" and that this

behavior is "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted). "In determining whether an actionable hostile work environment claim exists, [courts] look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002), quoting *Harris*, 510 U.S. at 23; *see also Baloch*, 550 F.3d at 1201.

Although a plaintiff is not required to plead a prima facie case of hostile work environment in the complaint, *Ali*, 697 F. Supp. 2d at 92, the alleged facts must be able to support such a claim, *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 78 (D.D.C. 2007), citing *Sparrow*, 216 F.3d at 1114. "[M]ere reference to alleged disparate acts of discrimination cannot be transformed, *without more*, into a hostile work environment claim." *Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 79 (D.D.C. 2005) (emphasis added), *aff'd* 187 Fed. App'x. 1 (D.C. Cir. 2006); *see also Nat'l R.R.*, 536 U.S. at 115 (noting that hostile work environment claims are "different in kind from discrete acts," in that they must be "based upon the cumulative effect of individual acts"); *Wade v. Dist. of Columbia*, No. 08-1187, 2011 WL 1491075, at *19 (D.D.C. Apr. 20, 2011) (dismissing the plaintiff's hostile work environment claim because the acts alleged were based on work-related actions by supervisors, not pervasive incidents of intimidation, ridicule, or insult); *Nunridden v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (dismissing plaintiff's hostile work environment claim because plaintiff merely sought "to transform challenges to discrete acts of alleged discrimination or retaliation . . . into a

hostile work environment claim by combining those events with a series of ordinary workplace difficulties").

In addition to the adverse employment actions that he alleges for his discrimination claim, plaintiff identifies some "harassing" conduct in support of his hostile work environment claims that does not constitute mere work-related actions by supervisors.  The alleged conduct includes:

- Plaintiff was "constantly subjected to negative commentary and belittling by his supervisors," Am. Compl. ¶ 178, and they "frequently ridiculed his knowledge, performance, and work product," *id.* ¶ 242.  This ridicule caused him "embarrassment, humiliation, and indignity," *id.* ¶ 248, as well as "mental anguish [and] physical harm," *id.* ¶ 254, and "exacerbated [his] disability, anxiety and depression," *id.* ¶ 253.

- Mr. Callahan "became irate towards [plaintiff] regardless of what he was working on." *Id.* ¶ 179.

- Mr. O'Neill became "belligerent" towards plaintiff, "angrily moved closer to [plaintiff]" with "his face and hands . . . tightly clenched, giving the impression that he was prepared to physically attack [plaintiff]" and causing plaintiff to "fe[el] physically threatened." *Id.* ¶¶ 217, 220–22.

- Plaintiff's supervisors allegedly made disparaging remarks about him and other minority employees at the arbitration of the NAGE complaint brought on behalf of Ms. Brown.  *Id.* ¶¶ 31, 34, 79–80.

- HRD contested plaintiff's workers' compensation claim for injuries sustained from the "altercation with Ms. Bermudez" and "accused [plaintiff] of lying about his physical symptoms following the incident." *Id.* ¶ 106.

Here, much of what fattens the complaint is discontent over general personnel disputes. *See, e.g.*, Am. Compl. ¶¶ 101–110 (alleging personnel disputes with is supervisor Mr. Callahan about leave and Flexiplace); *id.* ¶¶ 172–177 (alleging personnel disputes with Mr. Callahan and another supervisor Mr. O'Neill regarding work deadlines, the content of assignments, and work reports).  A hostile work environment claim is not appropriate for the "ordinary tribulations of

the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted).

Moreover, plaintiff does not assert that this allegedly harassing conduct was based on his race or disability.  "The workplace becomes 'hostile' . . . only when it is 'permeated with *discriminatory* intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Rattigan*, 503 F. Supp. 2d at 78 (emphasis added), quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *see also Childs-Pierce*, 383 F. Supp. 2d at 79 (D.D.C. 2005) ("[M]ere reference to alleged disparate acts of discrimination against plaintiff cannot be transformed, without more, into a hostile work environment."); *see Harris v. Wackenhut Servs.*, 419 Fed. App'x 1, 1 (D.C. Cir. 2011) (finding that plaintiff's evidence "bears no connection to his race and therefore cannot support a hostile work environment claim").  The amended complaint contains the conclusory allegation that the "insult, verbal and physical intimidation, and frequent[] ridicule[ of] his knowledge, performance, and work product" was "a result of [his] membership in a protected class," Am. Compl. ¶ 242, and plaintiff does allege that other minority employees suffered similar harassing treatment, *see id.* ¶¶ 64, 69–71, 82, 95–96.  But plaintiff does not set forth any facts that would tend to show that the treatment he experienced bore any connection to his race or to his disability.  Rather, plaintiff consistently alleges that the "harassing" conduct was in retaliation for his testimony against Ms. Mathes, and plaintiff has

brought other claims to redress those allegations.[7]   Therefore, the Court will grant defendant's motion to dismiss Counts II and VII.

C.   Title VII Retaliation Claim (Count III)

Plaintiff next claims that defendant retaliated against him for his "assertion of his rights [under Title VII] to complain that he was discriminated against because he is Hispanic, his involvement as a witness in support of Ms. Brown, and his own EEO complaints."  Am. Compl. ¶ 252.   Defendant contends that plaintiff's retaliation claim should fail because the alleged actions of the employer do not amount to adverse action, and plaintiff is unable to demonstrate that defendant's proffered reasons for the actions are pretextual.  Def.'s Mot. at 5, 11.  Defendant claims that plaintiff's "failure to demonstrate a materially adverse action [for his retaliation claim] entitles the Defendant to judgment as a matter of law."  Def's Mem. at 10.   But the retaliation claim is supported by factual allegations that plaintiff faced numerous adverse actions because of his participation in a protected activity – testifying against Ms. Mathes before the EEOC and filing his own EEO complaints – and therefore, Count III survives the motion to dismiss.

Title VII makes it unlawful to discriminate against an employee who "opposed any practice" made unlawful by Title VII or who "made a charge, testified, assisted or participated in a Title VII proceeding or investigation."  *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S.

---

7       Some courts in this circuit have recognized claims of hostile work environment based on retaliation, but the Court need not decide whether Title VII provides a cause of action for such claims or whether plaintiff succeeds in stating such a claim because plaintiff does not allege hostile work environment based on retaliation here; his Title VII hostile work environment Count is based solely on race.   *See* Am. Compl. ¶ 242 ("As a result of Mr. Morales's membership in a protected class, PBGC officials subjected Mr. Morales to insult, verbal and physical intimidation," etc.); Am. Compl. ¶ 245 ("PBGC violated Mr. Morales's right to equal employment opportunity by allowing and failing to rectify a hostile work environment based on race in violation of Title VII.").

53, 56 (2006) (quotation marks omitted).  To prove a retaliation claim, a plaintiff must show

"materially adverse action" by his employer.  *Baloch*, 550 F.3d at 1198.  Materially adverse

actions "encompass a broader sweep of actions than those in a pure discrimination claim," *id.* at

1198 n.4, because they are "'not limited to discriminatory actions that affect the terms and

conditions of employment' and may extend to harms that are not workplace-related so long as 'a

reasonable employee would have found the challenged action materially adverse,'" *id.*, quoting

*Burlington N.*, 548 U.S. at 64, 68.  Thus, to be "materially adverse," an action need only be of

the type that "might have dissuaded a reasonable worker from making or supporting a charge of

discrimination."  *Burlington N.*, 548 U.S. at 68, quoting *Rochon*, 438 F.3d at 1219.

Plaintiff alleges several actions that could be considered materially adverse.  First, non-

selection constitutes a materially adverse action in the retaliation context, just as in the

discrimination context.  *Baloch*, 550 F.3d at 1198; *see, e.g.*, *Benjamin*, 694 F. Supp. 2d at 6.

Further, courts have found that the other actions plaintiff describes may constitute materially

adverse actions in the retaliation context, even without resulting economic harm.  For example,

burdening an employee with retaliatory work assignments, such as the ATB project plaintiff

alleges was assigned to him in retaliation for his protected activity, could be considered

materially adverse.  *See Burlington N.*, 548 U.S. at 70–71 ("Common sense suggests that one

good way to discourage an employee . . . from bringing discrimination charges would be to insist

that []he spend more time performing the more arduous duties and less time performing those

that are easier or more agreeable.").  Plaintiff claims that the ATB project was more arduous than

his typical work because he was given too little time to complete it, *see* Am. Compl. ¶¶ 46–

47, 62, and that his supervisors used his inability to complete the work on time as a basis for

negative evaluations.  *Id.* ¶ 176.  So, this could reasonably be considered materially adverse

under *Burlington Northern*, 548 U.S. at 71.   Moreover, his allegation that the requirement imposed on him to provide daily updates on his progress "was an effort to . . . retaliate against him for his EEO activities," Am. Compl. ¶ 52, could similarly be considered an arduous duty that might discourage plaintiff from bringing discrimination charges.  *See Burlington N.*, 548 U.S. at 70–71.

Furthermore, plaintiff pleads sufficient facts to connect the adverse actions to his protected activity – testifying on behalf of Ms. Brown and against Ms. Mathes at an EEOC hearing, complaining about the discrimination he was facing, and filing his own EEO complaints.  He claims that:

- "prior to testifying against Ms. Mathes, Mr. Morales received numerous awards and consistently received exemplary performance appraisals," Am. Compl. ¶ 63, but after his participation, "Ms. Mathes treated Mr. Morales and the other non Caucasian/white employees differently . . . ," *id.* ¶ 64.

- The first time Ms. Mathes gave Mr. Morales an unreasonable deadline was after he testified against her.  *Id.* ¶ 47–48.

- Two other employees who also testified against Ms. Mathes were subjected to the same adverse treatment after their participation.  *Id.* ¶¶ 69–71, 74.

- "The criticism by Mr. Callahan and later Mr. O'Neill was in extreme contrast to how Mr. Morales had been assessed in his performance appraisals before Mr. Morales began filing his own EEO complaints and requesting a reasonable accommodation."  *Id.* ¶ 180.

- Mr. Morales suffered a decline in performance ratings "immediately after Mr. Morales started filing his own EEO complaints and requesting a reasonable accommodation."  *Id.* ¶ 181.

These assertions, as well as those set forth in section A (1) above, when viewed in the light most favorable to the plaintiff, are sufficient to allege a facially plausible claim that the adverse actions Mr. Morales suffered were retaliatory.

As to defendant's pretext argument, a plaintiff alleging retaliation is not required to discredit defendant's proffered reasons for its actions at this stage of the proceedings. *Winston*, 712 F. Supp. 2d at 11 (stating that plaintiff faces a "low hurdle" at the motion to dismiss stage); *Rhodes v. Napolitano*, 656 F. Supp. 2d 174, 186 (D.D.C. 2009) (finding plaintiff's allegations that materially adverse actions were caused by plaintiff's protected activity "sufficient to survive a motion to dismiss"); *Vance v. Chao*, 496 F. Supp. 2d 182, 186–87 (D.D.C. 2007) (same). "[I]n order to survive a motion to dismiss, 'all [the] complaint has to say,' is 'the Government retaliated against me because I engaged in protected activity." *Rochon*, 438 F.3d at 1219–20 (internal citations omitted), quoting *Sparrow*, 216 F.3d at 1114–15.

Thus, because plaintiff alleges that defendant retaliated against him because of his participation in protected activity, and the actions he alleges could plausibly constitute materially adverse actions, plaintiff's retaliation claim (Count III) survives defendant's motion to dismiss.

D. Plaintiff's Reasonable Accommodations Claim

Count V of the amended complaint alleges that defendant failed to reasonably accommodate plaintiff's disability in violation of the Rehabilitation Act. Specifically, plaintiff alleges that it was necessary that he be permitted to work from home for three days per week. But since the complaint specifically states that defendant *did* permit plaintiff to work from home on the very schedule he requested, plaintiff has failed to state a claim based on a failure to accommodate him.

Plaintiff acknowledges that he was permitted to work from home, but he seeks damages under the Rehabilitation Act on the grounds that defendant encumbered the accommodation with unnecessary unpleasantness. "PBGC failed to satisfy this reasonable accommodation by letting Mr. Morales's supervisors subject his work to undue scrutiny because he was working at home,

providing him with work assignments that could not be completed from home, and acting in direct contrast to the reasons for his reasonable accommodation." Am. Compl. ¶ 270.[8]  This is not a legally actionable theory for a reasonable accommodations claim.

The Rehabilitation Act requires an agency to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the agency] can demonstrate that the accommodation would impose an undue hardship . . . ."  42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a); *see also Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993) ("[Section 501's] basic tenet is that the Government must take reasonable affirmative steps to accommodate the [disabled], except where undue hardship would result.").

"To establish a prima facie case of discrimination under the Rehabilitation Act for an employer's failure to reasonably accommodate a disability, a plaintiff must show (1) that []he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [his] disability; (3) that with reasonable accommodation [he] could perform the essential functions of the position; and (4) that the employer refused to make the accommodation."  *Loya v. Sebelius*, -- F.Supp. 2d --, 2012 WL 52265, at *9 (D.D.C. Jan. 10, 2012) (internal quotation marks and alterations omitted); *see also Barth*, 2 F.3d at 1186.  The fourth element is a "fundamental" one:  "An underlying assumption of any reasonable

---

8        The parties treat the count as alleging three different reasonable accommodation claims: (1) that defendant improperly refused to allow plaintiff to work from home, (2) that defendant improperly denied his request for a detail at another agency, and (3) that defendant improperly required plaintiff to submit additional medical documentation when he sought to modify the arrangement and work at home for four days a week. *See* Def.'s Mem. at 31–35; Pl.'s Opp. at 27–32.  Although the amended complaint does describe all of those circumstances, Count V, which alleges that defendant failed to reasonably accommodate plaintiff's disability, is based solely on defendant's alleged refusal to allow plaintiff to work from home. *See* Am. Compl. ¶¶ 262–71.  Therefore, the Court will address only that one claim.

accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Flemmings v. Howard Univ.*, 198 F.3d 857, 861–62 (D.C. Cir. 1999) (finding that plaintiff's case lacked a "fundamental element" because the only request for accommodation made by her in the relevant time period was granted by her employer).

Here, the first three elements of plaintiff's reasonable accommodations claims are not in dispute:  defendant, having granted plaintiff's request to work from home for three days per week, concedes that plaintiff was a "qualified individual with a disability," that it was on notice of plaintiff's disability, and that working from home three days per week was a reasonable accommodation.  Am. Compl. ¶ 140.  Thus, only the fourth element is at issue:  whether defendant refused to make the accommodation.

In Count V, plaintiff concludes that defendant "failed to satisfy" the reasonable accommodation it granted him because his work was subjected to additional scrutiny and his supervisors provided him with work assignments that could not be completed from home.  Am. Compl. ¶ 270.  But the facts set out in the amended complaint do not bear this out.  Although plaintiff alleges that his supervisors "attempted" to make him come into the office during the period he was supposed to be working from home, *see id.* ¶¶ 183, 185, 187–88; that they offered him a "windowless room" across the street from PBGC so that he could do work that needed to be done onsite without actually being in the office, *id.* ¶ 186; and that they scrutinized his work and made him report to his supervisors while he was working from home, *id.* ¶ 172; he does not allege that he was ever actually required to relinquish his right to spend the three days at home, or to report to the windowless office or any other location.  Rather, he devotes several paragraphs to his home printing problems, thereby indicating that he continued to work from home.  *See, e.g.*, Am. Compl. ¶ 211–16.  Therefore, the amended complaint does not contain factual

allegations from which the Court could plausibly conclude that his employer refused to make the reasonable accommodation, and the Court will grant defendant's motion to dismiss Count V.[9]

     E.  <u>Plaintiff's Constructive Discharge Claims</u>

Counts IV and VIII of the amended complaint allege constructive discharge in violation of Title VII and the Rehabilitation Act, respectively.   Under the Title VII count (Count IV), plaintiff claims that "the actions of PBGC management caused [him] so much stress that he was forced to apply for disability retirement with the Office of Personnel Management ("OPM")." Am. Compl. ¶ 228.   Under the Rehabilitation Act count (Count VIII), plaintiff claims that PBGC management failed to take reasonable steps to end the harassment to which Mr. Morales was subjected on a daily basis, and the abusive working environment became so intolerable that his resignation qualified as a fitting response. *Id.* ¶¶ 292–93.

Defendant contends that these claims must fail because plaintiff "cannot establish that he suffered from a hostile work environment and that his conditions were so intolerable that he was forced to quit," and "he has not set forth 'aggravating factors' to support such a claim."   Def.'s Mem. at 39.   To establish a constructive discharge claim under Title VII or the Rehabilitation Act, a plaintiff must prove that "(1) intentional discrimination existed, (2) the employer

---

9     Even if the Court very generously construed plaintiff's statement under Count V that "the reasonable accommodation provided for Mr. Morales's disability allowed him to work from home three, and later four, days per week" as alleging that defendant failed to reasonably accommodate him when it required him to submit additional medical documentation in support of his request to work a fourth day a week from home, *see* Am. Compl. ¶¶ 215–16, it would still grant defendant's motion to dismiss Count V.   Plaintiff does not allege that defendant denied his request to work from home an additional day; only that it requested that plaintiff provide additional documentation, which it may do under applicable regulations.   Am. Compl ¶¶ 226–27; *see, e.g, Branwell v. Blakely*, No. 04-927, 2006 WL 1442655, at *6 (D.D.C. May 24, 2006) ("An employer is not required to provide an accommodation prior to receiving medical documentation that substantiates the employee's need for accommodation."), citing *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).   Thus, plaintiff again fails to allege the fundamental element of a reasonable accommodations claim:  that defendant denied his request.

deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that []he had no option but to end [his] employment." *Carter v. George Wash. Univ.*, 180 F. Supp. 2d 97, 110 (D.D.C. 2001) (Title VII), citing *Clark v. Marsh*, 665 F.2d 1168, 1173–74 (D.C. Cir. 1981); *see Cole v. Powell*, 605 F. Supp. 2d 20, 25 (D.D.C. 2009) (Rehabilitation Act); *see also Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (holding that a plaintiff alleging constructive discharge must show that the "employer deliberately made working conditions intolerable and drove the employee out" of the position) (internal quotation marks omitted).

"The mere existence of workplace discrimination is insufficient to make out a constructive discharge claim." *Veitch v. England*, 471 F.3d 124, 130 (D.C. Cir. 2006). Constructive discharge "does not occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive, even if the employer's misbehavior creates the unpleasantness or . . . its largesse affirmatively increases the appeal of the employee's alternatives." *Taylor v. FDIC*, 132 F.3d 753, 766 (D.C. Cir. 1997). Rather, constructive discharge "requires a finding of discrimination *and* the existence of certain 'aggravating factors'" that would force a reasonable employee to resign. *Veitch*, 471 F.3d at 130, quoting *Mungin*, 116 F.3d at 1558 (emphasis in original); *see also Mungin*, 116 F.3d at 1558 (stating that aggravating factors are "those things that would force an employee to leave").

In applying these principles, the Court notes first that it has already found that the amended complaint does not sufficiently allege either discrimination or hostile work environment on the basis of plaintiff's disability, so it cannot find on the same facts that plaintiff suffered discrimination that rose to the level of constructive discharge under the Rehabilitation Act. Therefore, Count VIII will be dismissed. *See Manuel v. Potter*, 685 F. Supp. 2d 46, 71

(D.D.C. 2010) ("Having determined that the defendant is entitled to summary judgment on the plaintiff's underlying discrimination . . . claims, his constructive discharge claim consequently also fails.").

As to the Title VII claim, plaintiff also fails to allege facts that plausibly give rise to a claim of constructive discharge. Specifically, he fails to allege facts supporting that his "employer deliberately made working conditions intolerable and drove [him] out." *Mungin*, 116 F.3d at 1558 (internal quotation marks omitted).

Plaintiff alleges that "[t]he abusive working environment became so intolerable that [plaintiff's] resignation qualified as a fitting response" and that his "working conditions were so intolerable that a reasonable person in his position would have felt compelled to resign under the circumstances." Am. Compl. ¶¶ 259–60. Yet plaintiff fails to allege facts that sufficiently support these allegations. *See Bryant v. Pepco*, 730 F. Supp. 2d 25, 32 (D.D.C. 2010) ("'formulaic recitation'" of the elements of constructive discharge is insufficient to state a claim under *Twombly*), quoting *Twombly*, 550 U.S. at 556. He relies on allegations that his manager, Ms. Mathes, subjected him to arbitrary and unrealistic deadlines and required him to provide daily updates to her as a way of harassing him because of his race and in retaliation for testifying against her. *See* Am. Compl. ¶ 52, 62. He also alleges that the employer's failure to investigate allegations that Ms. Mathes engaged in discrimination provided tacit permission for her to continue. *Id.* ¶ 67. But before plaintiff filed for disability retirement, Ms. Mathes had already been removed from her position as team lead and stripped of her management responsibilities. *Id.* ¶¶ 86, 123. So the actions of Ms. Mathes alone cannot rise to the level of constructive discharge.

Plaintiff also alleges a number of personnel disputes with two other managers, Mr. Callahan and Mr. O'Neill.  But even if the Court accepts all of these allegations as true, they are insufficient to make the work environment "so intolerable that a reasonable person in [plaintiff's] position would have felt compelled to resign."  *Veitch*, 471 F.3d at 130.  The majority of the allegations involving those supervisors related to mere personnel disputes, such as: disputes about plaintiff's leave balance, *id.* ¶¶ 101, 105–106, 117, 121, 202–07, 222–23; who could represent him in his EEO complaint, *id.* ¶¶ 108–109; how much time he could take to review his EEO documents, *id.* ¶¶ 110–115; whether he could utilize Flexiplace to work from home and attend his grandmother's funeral, *id.* ¶¶ 118–120; how often supervisors inquired into what he was doing when he worked from home, *id.* ¶¶ 172–74; his work quality, *id.* ¶¶ 175–82; and, last but not least, his printer. ¶¶ 211–219.

Plaintiff also alleges that "he was being omitted from legitimate projects, his work product was questioned and critiqued without justification, he was denied training, and the performance standards for his position were changed to be inherently subjective and unattainable," *id.* ¶ 125, and that the criticism he experienced from Mr. Callahan and Mr. O'Neill began only after plaintiff started filing his own EEO complaints and requesting reasonable accommodations. *Id.* ¶ 180.  In some cases, courts have found that allegations that the employer engaged in a continuous discriminatory pattern of depriving the employee of opportunities to advance may constitute constructive discharge, but only where the employee "vigorously pursued" opportunities for advancement, and the continuous denial "locked [him] into a position from which he could obtain no relief."  *Clark*, 665 F.2d at 1173–74 (the plaintiff had been seeking advancement for eleven years, but despite "an outstanding employment record," she was "continuously spurned."); *see also Jones v. Bernanke*, 685 F. Supp. 2d 31, 40–41 (finding that

plaintiff's allegations that his employer continued to present him with false evaluations for a period of four years, which effectively precluded him from any further advancement in his career, succeeded in stating a plausible claim for constructive discharge).  But plaintiff only alleges that he was denied a promotion once, that he was denied opportunities for Contracting Officer's Technical Representative Training, funding for a graduate program, and the opportunity to work on high profile assignments, that he was subjected to a new performance standard system, and that his work was criticized.  This falls far short of the continuous denial of opportunities for advancement that Mr. Morales would need to allege in order to show that he was essentially locked into a position from which he could obtain no relief.  *See Veitch*, 471 F.3d at 130–31 (constructive discharge claim by an evangelical Protestant Navy chaplain fails where there was the existence of a "general anti-evangelical environment" in the work place, and pattern of alleged harassment by supervisor, including tearing a "Reformation Conference" poster from his wall, and assigning him to conduct prayer services "inimical" to his religious beliefs); *Taylor*, 132 F.3d at 766 (reassignment of employees to a separate office for a period of years where they were denied meaningful work, support staff, and supplies, and "ostracized by former colleagues afraid to be seen with them" was insufficient to satisfy the requirements of constructive discharge);[10] *Cannon v. Paulson*, 531 F. Supp. 2d 1, 7–8 (D.D.C. 2008) (supervisor's repeated requests that employee retire, act of barring him from an office building, and giving him only a "fully successful" review as compared to previous reviews of "outstanding" were insufficient to establish a constructive discharge claim).

---

10    While the court based its holding on the Resolution Trust Corporation Whistleblower Act, 12 U.S.C. § 1441a (repealed 2010), its reasoning was premised on interpretations of Title VII by other courts.

It appears to the Court that although plaintiff did not enjoy a positive relationship with his direct supervisors, he does not allege sufficient facts to plead a constructive discharge claim. Therefore, the Court will grant defendant's motion to dismiss Counts IV and VIII.

## MOTION FOR SUMMARY JUDGMENT

### I. Plaintiff's Motion for Rule 56(d) Relief[11]

Rule 56(d) provides that:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

The D.C. Circuit has emphasized the "substantial interests served by a fair and complete judicial fact-finding process, replete with the tools of discovery and compulsory process." *Ikossi v. Dep't of Navy*, 516 F.3d 1037, 1045 (D.C. Cir. 2008), quoting *Hackley v. Roudebush*, 520 F.2d 108, 149 (D.C. Cir. 1975). But the burden is on the plaintiff to state with "sufficient particularity . . . why discovery [is] necessary." *Strang v. US Arms Control & Disarmament Agency*, 864 F.2d 859, 861 (D.C. Cir. 1989); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (stating that any potential problem with premature motions for summary judgment can be adequately dealt with under Rule 56(f)); *First Chi. Int'l v. United Exchange Co., Ltd.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988) (plaintiff should be given a reasonable opportunity to pursue merits discovery before the court decides a motion for summary judgment). The Court will only consider plaintiff's request as to the Counts that survive the motion to dismiss: Counts I and III.

---

11    As mentioned above, plaintiffs' motion refers to Rule 56(f), but since the rule governing when the Court should deny a motion for summary judgment in order to allow time for discovery to proceed now appears at 56(d), the Court will construe the motion as seeking relief under Rule 56(d). However, since the 2010 amendment that changed Rule 56(f) to Rule 56(d) did not substantially change the content of the Rule, the Court will still rely on case law that relies on the former Rule 56(f). *See supra* note 1.

Plaintiff argues that discovery is necessary because there are disputes of material fact that can only be resolved through the discovery process. *See* Pl.'s Opp. at 32–34; Ex. 6 to Pl.'s Opp. [Dkt. # 31-7]. Specifically, he argues that there is extensive documentation which he needs to be able to examine to test the credibility of defendant's claimed legitimate, non-discriminatory reasons for its actions, such as the list of candidates for the lead accountant position for which he was rejected and the selecting official's notes. He also seeks to depose the selecting official. This is sufficient to support denying defendant's motion for summary judgment as to the disparate treatment claim, which is partially based on the PBGC's denial of his application for the GS-14 position (Count I).

Plaintiff also seeks to "test the appropriateness of PBGC management's arbitrary deadlines, level of supervision, and choice of assignments with other PBGC management and accountants" through deposition of PBGC management. Pl.'s Opp. at 34. Since depositions could potentially lead plaintiff to direct evidence of discrimination or retaliation, the Court finds that this justification supports denying defendant's motion for summary judgment as to the disparate treatment and retaliation claims (Counts I and III).

## CONCLUSION

For the foregoing reasons, it is ORDERED that defendant's motion to dismiss or, in the alternative, for summary judgment [Dkt. # 26] is:

GRANTED without prejudice as to the motion to dismiss Counts II, IV, V, VI, VII, and VIII;

DENIED as to the motion to dismiss Counts I and III; and

DENIED as to the motion for summary judgment pursuant to Fed. R. Civ. P. 56(d) without prejudice to the filing of dispositive motions after sufficient opportunity to conduct merit discovery.   Although the Court dismisses several of plaintiff's claims, plaintiff will still have ample opportunity to litigate his Title VII discrimination and retaliation claims on the merits.


AMY BERMAN JACKSON
United States District Judge

DATE:  April 17, 2012