# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
PAUL E. MORALES,                          )
                                          )
            Plaintiff,                    )
                                          )
    v.                                    )      Civil Action No. 10-0221 (ABJ)
                                          )
JOSHUA GOTBAUM, Director,                 )
Pension Benefit Guaranty Corporation,     )
                                          )
                                          )
            Defendant.                    )
———————————————————— )

## MEMORANDUM OPINION

This case is before the Court on defendant's motion for summary judgment on the two remaining counts in this case:  Count I, racial discrimination in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-2 (2012), and Count III, retaliation in violation of Title VII, 42 U.S.C. § 2000e-3.  Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") [Dkt. # 58-1].  Plaintiff opposes the motion, arguing that there are still factual issues in dispute.  Pl.'s Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp.") [Dkt. # 60-1].  But the Court finds that the facts in dispute are not material to the disposition of the case, and it concludes that plaintiff has failed to show that many of the asserted discriminatory and retaliatory actions are adverse actions within the meaning Title VII, and that he has failed to rebut defendant's legitimate, nondiscriminatory or nonretaliatory reasons for the others.  Accordingly, the Court will grant defendant's motion for summary judgment as to both counts.

# BACKGROUND[1]

Plaintiff Paul Morales is a Hispanic male of Mexican national origin. Def.'s Statement of Material Facts as to which there is No Genuine Dispute ("Def.'s SOF") ¶ 2 [Dkt. # 58-2]; *see also* Am. Compl. ¶ 2 [Dkt. # 23]. Defendant Joshua Gotbaum is the Director of the Pension Benefit Guaranty Corporation ("PBGC") and is being sued in his official capacity. From 2001 to March 2010, plaintiff worked for PBGC as an Accountant in the Financial Operations Department of the Collection and Compliance Division ("CCD") in Washington, D.C., most recently at the GS-13 level. Def.'s SOF ¶¶ 2–3; Am. Compl. ¶¶ 2–3.

The facts relevant to this case took place between the years of 2007 and 2010. During that time, there were various supervisors in CCD. Robert Callahan – a Caucasian male whose official title was Financial Program Manager – served as plaintiff's first-line supervisor. Def.'s SOF ¶ 5. Matthew Vitello – a Caucasian male in the position of a GS-14 Lead Accountant – served as plaintiff's Team Lead until October 2009 when Callahan hired William O'Neill – a Caucasian male – as a GS-14 Lead Accountant. *Id.* ¶ 9; Attach. 3 to Decl. of Robert Callahan at 22 [Dkt. # 58-3]. O'Neill became plaintiff's Team Lead at that time. Attach. 3 to Decl. of Robert Callahan at 22. Finally, Sherry Mathes – a Caucasian female – also held the position of GS-14 Lead Accountant during the period of 2007 to 2008, but she did not serve as plaintiff's Team Lead during that period, except for three days in May 2008. Def.'s SOF ¶ 8.

---

1    Defendant previously filed a motion to dismiss, which the Court granted in part and denied in part. The memorandum opinion that accompanied that order provided a more detailed overview of the facts, which the Court now incorporates by reference in this opinion. *See Morales v. Gotbaum*, No. 10-cv-221 (D.D.C. Apr. 17, 2012).

From 2007 to 2009, while employed at the agency, plaintiff engaged in several Title VII protected activities.[2] He claims that, starting in 2008, his supervisors began retaliating against plaintiff for his involvement in those activities, and that his supervisors also discriminated against him on the basis of his race.[3]

---

[2] Plaintiff asserts, and defendant does not contest, that he engaged in the following protected activities over the course of two years:

- In May 2007, plaintiff testified in support of Lydia Brown, a fellow employee, during an investigation into Brown's Equal Employment Opportunity ("EEO") action against PBGC. Def.'s SOF ¶ 19; Pl.'s Opp. at 19. He also provided a witness affidavit in support of her formal complaint of discrimination. Def.'s SOF ¶ 20; Pl.'s Opp. at 19.

- Sometime between April 30 and August 1, 2008, plaintiff testified again in support of Brown during the arbitration of an Institutional Grievance filed by the representative union. Def.'s SOF ¶¶ 23–25; Pl.'s Opp. at 19.

- On August 26, 2008, plaintiff filed an EEO administrative complaint, alleging discrimination and hostile work environment on the basis of race, age, and reprisal. Def.'s SOF ¶ 10; Pl.'s Opp. at 19.

- On September 25, 2008, plaintiff filed his second administrative EEO complaint, asserting the same claims but basing them on additional evidence. Def.'s SOF ¶ 11; Pl.'s Opp. at 19.

- And on February 11, 2009, February 23, 2009, and March 9, 2009, plaintiff filed three separate amendments to his administrative EEO complaints, complaining that his supervisors retaliated against him for his participation in EEO activities on several occasions. Def.'s SOF ¶¶ 12–14; Pl.'s Opp. at 20.

Plaintiff also states that on December 12, 2008, he "openly voiced his concerns regarding discrimination and retaliation in the workplace during a CCD meeting," and that he informed Vitello and Callahan that he was preparing his own EEO complaint and testifying on behalf of other CCD employees on January 6, 2009. Pl.'s Opp. at 20. Finally, plaintiff asserts that on January 8, 2009, he requested a reasonable accommodation for his disabilities. *Id.*

[3] Plaintiff's amended complaint also included claims for age discrimination, hostile work environment, constructive discharge, failure to provide reasonable accommodations, and discrimination on the basis of a disability. Those counts have been dismissed. *See Gotbaum*, No. 10-cv-221, slip. op. at 3.

Specifically, plaintiff claims that his supervisors took the following actions in order to discriminate and retaliate against him:

- In mid-2007, Callahan was responsible for selecting individuals to participate in the Premium and Practitioners System User Acceptance Test Plan ("UAT program"). Def.'s SOF ¶ 44. Plaintiff was not selected to participate in that program. *Id.* ¶ 46; *see also* Pl.'s Statement of Material Facts that are in Dispute ("Pl.'s SOF") ¶ 15 [Dkt. # 60-2].

- On May 16, 2008, during the week that Mathes supervised plaintiff, she assigned to plaintiff a project on "aged trial balances" ("ATB project") and gave plaintiff two weeks to complete it. Def.'s SOF ¶¶ 29, 31–32; Pl.'s SOF ¶ 6. When plaintiff responded that he would be unable to meet the two-week deadline due to the demands of his workload, Mathes requested that plaintiff provide her with daily reports on his progress. Def.'s SOF ¶ 33; Pl.'s SOF ¶ 7.

- Sometime between December 2008 and February 2009, PBGC's Department of Human Resources allegedly interfered with plaintiff's ability to obtain worker's compensation for a work-related injury. Pl.'s Opp. at 6.

- On January 15 and 22, 2009, Callahan denied a request made by Richard Anderson – plaintiff's colleague and EEO representative – for official time to assist plaintiff with his EEO complaint. Pl.'s Opp. at 5.

- In February 2009, Callahan denied plaintiff's request for one day of advanced sick leave. *See* Pl.'s Opp. at 6.

- Also in February 2009, Callahan denied plaintiff's request to attend the United States Department of Agriculture's Leadership Development program ("USDA Leadership program"). Def.'s SOF ¶¶ 50–53; *see also* Pl.'s SOF ¶ 16.

- In July 2009, a GS-14 Lead Account position ("the 2009 Team Lead position") became available. Def.'s SOF ¶ 62; Pl.'s Opp. at 7. Plaintiff submitted a timely application and was found to be minimally qualified for the position, but Callahan – who served as the selecting official – did not interview him. Def.'s SOF ¶¶ 63–67; Pl.'s Opp. at 7. Callahan hired O'Neill instead. Def.'s SOF ¶ 68; Pl.'s Opp. at 7.

- On October 6, 2009, O'Neill – plaintiff's new Team Lead – assigned him the High Dollar Credit Review project and set a target deadline of October 31, 2009. Def.'s SOF ¶ 39; Oct. 6, 2009 Email from Bill O'Neill to Paul Morales ("O'Neill Email"), Ex. S to Pl.'s Mem at 24 [Dkt. # 60-21]. O'Neill also asked plaintiff to provide him with weekly updates on his progress. Def.'s SOF ¶ 39; O'Neill Email at 24. Plaintiff responded that he could not complete the project in three weeks. Oct. 8, 2009 Email from Paul Morales to Bill O'Neill, Ex. S to Pl.'s Mem. at 19 [Dkt. # 60-21]; *see also* Pl.'s SOF ¶ 12.

- Also in October 2009, CCD implemented new performance standards for all of its employees. Def.'s SOF ¶ 55; Pl.'s Opp. at 6.

- Plaintiff's overall performance standard for 2009 was "meets expectations," which was a step below his "excellent" rating the year before. Def.'s SOF ¶ 58.

- On November 18, 2009, Callahan assigned plaintiff the Credit Balance Review project and asked him to complete it by the end of the day. Def.'s SOF ¶ 42. Plaintiff stated that he could not complete the project in that time, and Callahan then asked him to finish it by noon that same day. Pl.'s SOF ¶ 14.

Ultimately, plaintiff alleges that the "actions of PBGC management caused [him] so much stress that he was forced to apply for disability retirement." Am. Compl. ¶ 228; *see also* Pl.'s Opp. at 8. He went on leave without pay in April 2010, and his disability retirement was granted and became effective on May 1, 2010. Am. Compl. ¶ 231.

Plaintiff filed the original complaint giving rise to this case on February 12, 2010 [Dkt. # 1], and he filed an amended complaint on March 2, 2011 [Dkt. # 23]. Defendant filed a motion to dismiss the amended complaint, or in the alternative, for summary judgment under Federal Rules of Civil Procedure 12(b)(6) and 56(a) [Dkt. # 26]. Plaintiff opposed the motion to dismiss and took the position that discovery was needed before any motion for summary judgment could be considered [Dkt. # 31].

The Court partially granted defendant's motion to dismiss and dismissed Counts II, IV, V, VI, VII, and VIII for failure to state a claim upon which relief could be granted. *Morales v. Gotbaum*, No. 10-cv-221 (D.D.C. Apr. 17, 2012). Counts I (racial discrimination) and III (Title VII retaliation) were left standing. *Id.* As to those counts, the Court granted plaintiff's request for discovery under Federal Rule of Civil Procedure 56(d) and denied defendant's motion for summary judgment. *Id.*

Upon the completion of discovery, defendant moved once more for summary judgment, arguing that he is entitled to judgment as a matter of law on Counts I and III and providing the

Court with a statement of material facts that are not in dispute. Def.'s Mot. for Summ. J. [Dkt. # 58]. Plaintiff maintains that there are genuine issues of material fact that preclude judgment as a matter of law. Pl.'s Opp.; Pl.'s SOF.

## STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

Title VII of the Civil Rights Act of 1964 is one of the statutory schemes that Congress enacted to implement "the federal policy of prohibiting wrongful discrimination in the Nation's workplaces." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522 (2013). The antidiscrimination provision "makes it unlawful for an employer 'to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race'" or other protected characteristics. *Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008), quoting 42 U.S.C. § 2000e-2(a); *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008), citing 42 U.S.C. § 2000e-16(a) (noting that, to state a claim for disparate treatment under Title VII's antidiscrimination provision, the plaintiff must establish two essential elements: "that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability"). And the antiretaliation prong makes it unlawful for "an employer [to] 'discriminate against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006), quoting 42 U.S.C. § 2000e-3(a); *see also Steele*, 535 F.3d at 695.

Ordinarily when a plaintiff brings either a disparate treatment claim under the antidiscrimination provision or a unlawful retaliation claim under the antiretaliation provision and relies on circumstantial evidence to establish the employer's unlawful conduct, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*.[4]  411 U.S. 792 (1973); *see also Porter v. Shah*, 606 F.3d 809, 812–13 (D.C. Cir. 2010); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  But in cases like this one where the defendant

---

4       Under that framework, the plaintiff bears the initial burden of establishing his or her prima facie case. *McDonnell Douglas*, 411 U.S. at 802; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  Once a prima facie case is established, then "[t]he burden . . . must shift to the employer to articulate some legitimate, nondiscriminatory [or nonretaliatory] reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802; *Holcomb*, 433 F.3d at 896.  If a legitimate, nondiscriminatory or nonretaliatory reason is given, the burden shifts once more to the plaintiff to prove that the proffered reason is a pretext for discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 803; *Holcomb*, 433 F.3d at 896.

proffers legitimate, nondiscriminatory or nonretaliatory reasons for the challenged actions, the court need not conduct the threshold inquiry into whether the plaintiff established a prima facie case of discrimination or retaliation.[5] Instead, the court is required to proceed to analyze whether the defendant's asserted reason is in fact a legitimate, nondiscriminatory or nonretaliatory explanation.[6] *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008) ("Lest there be any lingering uncertainty, we state the rule clearly: In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."); *see also Bernanke*, 557 F.3d at 672 (noting that, once an employer asserts a legitimate, nonretaliatory reason for its action, the issue of whether the plaintiff established a prima facie case drops out and the sole inquiry for the court is "the question of retaliation *vel non*").

---

5    To establish a prima facie case of disparate treatment discrimination, "the plaintiff must establish that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination." *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002). To establish a prima facie case of retaliation, on the other hand, "the plaintiff must present evidence that (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to the exercise of her rights." *Holcomb*, 433 F.3d at 901–02.

6    For this reason, the Court will not assess whether plaintiff has met its burden to establish a prima facie case of discrimination or retaliation despite defendant's arguments that he has not. However, the Court will consider any alleged weaknesses in the plaintiff's prima facie case when determining whether plaintiff has met his burden to rebut the legitimate, nondiscriminatory and nonretaliatory explanations provided by defendant. *See Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 164 (D.D.C. 2013), quoting *Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013) ("[I]n evaluating whether the plaintiff has produced sufficient evidence for a reasonable jury to find that the defendant's stated reasons are pretextual, the Court may consider, among 'the total circumstances of the case,' the underlying strength of the plaintiff's prima facie case.").

Once the defendant has proffered a legitimate explanation, then the burdens shifts back to the plaintiff to demonstrate why the defendant is not entitled to judgment as a matter of law. In the context of a disparate treatment claim, the plaintiff may defeat summary judgment by proving either that the defendant's legitimate, nondiscriminatory reason is a pretext for discrimination, *McDonnell Douglas*, 411 U.S. at 803, or that the employment action was motivated by discrimination in addition to the proffered legitimate reason. *Nassar*, 133 S. Ct. at 2222–23; *Fogg v. Gonzales*, 492 F.3d 447, 451 (D.C. Cir. 2007); *see also Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008) (explaining the difference between a "single motive" and a "mixed-motive" disparate treatment case).

But in the context of a retaliation claim, the plaintiff must establish that retaliation was the "but-for cause" of the adverse action in order to survive summary judgment. *Nassar*, 133 S. Ct. at 2533. "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*

In both contexts, plaintiff bears the burden of persuasion. *McIntyre v. Peters*, 460 F. Supp. 2d 125, 132–33 (D.D.C. 2006). "[T]he only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation [or discrimination,] 'either directly by [showing] that a [retaliatory or] discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Bernanke*, 557 F.3d at 678, quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983). Here, plaintiff has not met that burden with respect to either Count I or Count III.

**I.     Defendant is entitled to summary judgment on Count I.**

In Count I of the amended complaint, plaintiff raises a disparate treatment discrimination claim under Title VII, alleging that his supervisors subjected him to several unfavorable

employment actions because of his race. Am. Compl. ¶¶ 233–39. Defendant responds that he is entitled to summary judgment on Count I because: (1) plaintiff failed to demonstrate that many of the alleged actions qualify as adverse actions under Title VII; and (2) while the nonselection for the Team Lead position in 2009 may be considered to be an adverse action, plaintiff has failed to rebut defendant's legitimate, nondiscriminatory explanation for why Callahan hired another candidate. Def.'s Mem. at 10–13.

**A. Only plaintiff's nonselection for the 2009 Team Lead position constitutes an adverse action under Title VII's antidiscrimination provision.[7]**

Plaintiff lists a number of events that he considers to be the adverse employment actions needed to satisfy the first element of his disparate treatment claim:

> 1) Plaintiff not being interviewed and selected for the GS-510-14 Lead Accountant position; 2) receiving a lower overall performance rating of "Meets Expectations" in his FY 2009 performance appraisal; 3) being given an unreasonable deadline to complete the ATB project; 4) being unduly required to provide daily progress reports while working on the ATB project; 5) despite making the request, not being given additional resources to assist with the completion of the ATB project; 6) being denied the opportunity to participate in the USDA Leadership Program; 7) being given an unreasonable deadline to complete the "High Dollar Credit Review Project;" 8) being unjustifiably required to provide weekly updates while working on the "High Dollar Credit Review Project;" 9) being given an unreasonable deadline to complete a "credit balance review assignment;" 10) being excluded from the UAT plan; and 11) being prevented from receiving assistance from his designated EEO representative in further of his EEO complaints.

---

[7]     Although the Court must not inquire as to whether plaintiff has established a prima facie case of discrimination (or retaliation), *Brady*, 520 F.3d at 493 ("[J]udicial inquiry into the prima facie case is usually misplaced."), that does not excuse plaintiff from his obligation to show that he suffered an adverse action, and it does not prevent the Court from determining whether the alleged discriminatory (or retaliatory) action was in fact an adverse action under Title VII before addressing whether plaintiff has rebutted defendant's legitimate, nondiscriminatory (or nonretaliatory) explanation. *See, e.g.*, *Dorns v. Geithner*, 692 F. Supp. 2d 119, 131 (D.D.C. 2010) ("Although this Court need not examine the plaintiff's prima facie case as a threshold matter, Title VII nevertheless requires that the plaintiff suffered some adverse employment action.").

Pl.'s Opp. at 11–12; *see also* Pl.'s SOF.  But only the first of these – plaintiff's nonselection claim – is an adverse employment action for purposes of Title VII's antidiscrimination provision.

Not "all personnel decisions with negative consequences for the employee satisfy" the requirement that the plaintiff suffer a legally cognizable adverse action in order to state a claim for relief under Title VII.  *Ware v. Billington*, 344 F. Supp. 2d 63, 71 (D.D.C. 2004).  "[M]ere idiosyncrasies of personal preference are not sufficient to state an injury," and "[p]urely subjective injuries, such as dissatisfaction with a reassignment or public humiliation or loss of reputation are not adverse actions."  *Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002) (citations and internal quotation marks omitted); *see also Ginger*, 527 F.3d at 1343.

Instead, "an employee suffers an adverse employment action" for purposes of establishing a disparate treatment claim under Title VII "if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Forkkio*, 306 F.3d at 1131; *see also Ginger*, 527 F.3d at 1343.  Courts have previously found objectively tangible harms where the adverse action results in a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits," *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009), or a "tangible change in the duties or working conditions constituting a material employment disadvantage."  *Mack v. Strauss*, 134 F. Supp. 2d 103, 111 (D.D.C. 2001) (citation and internal quotation marks omitted); *see also Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (stating that objectively tangible harm is often in the form of direct economic harm, such as affecting an employee's grade or salary).

Based on this legal framework, the Court has already observed that "the sorts of actions alleged by plaintiff, including giving negative performance feedback and denying training opportunities, do not constitute adverse employment actions." *Morales*, No. 10-cv-221, slip op. at 14. But since the complaint included "at least one allegation with clear adverse economic consequences: the claim that plaintiff was not selected . . . for the GS-14 accountant position," the Court permitted the discrimination count to go forward. *Id.* at 15.

Plaintiff has revived many of the same allegations in connection with the motion for summary judgment on the disparate treatment count, including the claims that he was assigned work with unreasonable deadlines, Am. Compl. ¶¶ 46–47, 159–65, 168–71; that he was subjected to excessive supervision, *id.* ¶ 50; that he was denied opportunities for training and to work on high-profile projects, *id.* ¶¶ 126–29; and that he received a performance evaluation that was less positive than those that had come before. Pl.'s Opp. at 19–20. But plaintiff still has not provided the necessary facts to demonstrate that those actions resulted in some objectively tangible harm to his employment status, *see* Pl.'s Opp.; Pl.'s SOF, and as a result, he cannot rest his disparate treatment claim on those grounds.[8] *See Porter*, 606 F.3d at 818, quoting *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (noting that a performance evaluation that did not affect the plaintiff's "'position, grade level, salary, or promotion opportunities'" was not a materially adverse action); *Doe v. Gates*, 828 F. Supp. 2d 266, 270 (D.D.C. 2011) (alteration in

---

8    Plaintiff also asserts that he suffered a materially adverse employment action when Callahan would not approve Richard Anderson's – plaintiff's EEO representative – request for time off to help plaintiff with plaintiff's EEO complaint. Pl.'s Opp. at 12. But plaintiff again fails to offer facts that show that, as a result of denying Anderson's request, plaintiff suffered consequences that affected "the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Holcomb*, 433 F.3d at 902, quoting *Forkkio*, 306 F.3d at 1130–31. Plaintiff does not allege that the denial resulted in economic harm to him or even that he was unable to file his EEO complaint as a result. Therefore, the denial cannot serve as the basis for his disparate treatment claim.

original), quoting *Edwards v. EPA*, 456 F. Supp. 2d 72, 85 (D.D.C. 2006) ("[T]he denial of a single training or travel opportunity does not constitute an adverse employment action unless the plaintiff can 'tie the alleged discriminatory employment action to some actual, tangible adverse employment consequence.'"). The Court will therefore consider only whether plaintiff has met his burden to establish that his nonselection for the Team Lead position was the product of racial animus.

## B. Plaintiff has not met his burden to rebut defendant's legitimate, nondiscriminatory explanation.

In response to plaintiff's claims for racial discrimination based on his nonselection for the Team Lead job in 2009, defendant offers the following explanation: "Mr. Callahan decided to interview only the applicants on the GS-14 certificate because none of the applicants on the GS-13 certificate had a significant amount of supervisory experience, and it was important to him that the person who filled this position have supervisory experience."[9] Def.'s SOF ¶ 65; *see also* Callahan Dep. 17:1–18:16, Feb. 26, 2013, Ex. 7 to Def.'s Mem. [Dkt. # 58-9]. Put differently, plaintiff was not interviewed or selected because the hiring official – Callahan – was looking for a level of experience plaintiff lacked, and that made the successful applicant, O'Neill, the better candidate for the position. This explanation is sufficient to meet defendant's burden to identify a legitimate, nondiscriminatory basis for the decision. *See Holcomb v. Powell*, 433 F.3d 889, 896 (D.C. Cir. 2006); *Onyewuchi v. Mayorkas*, 766 F. Supp. 2d 115, 121 (D.D.C. 2011).

The burden therefore shifts back to the plaintiff. At this point, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence

---

9    The certificate of eligibles is a list of applicants generated by PBGC's human resources department at the close of the job vacancy announcement. *See* Def.'s SOF ¶ 64. Only applicants that meet the minimum qualifications for the position are placed on a certificate of eligibles. *Id.* In this case, human resource specialist Brandy Pelham created two certificates of eligibles: one for applicants currently at the GS-13 level, and one for applicants currently at the GS-14 level.

that the adverse employment decision was made for a discriminatory reason." *Holcomb*, 433

F.3d at 896–97, quoting *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003); *see also*

*Porter*, 606 F.3d at 815. "All of the evidence" includes

> any combination of (1) evidence establishing the plaintiff's prima
> facie case; (2) evidence the plaintiff presents to attack the
> employer's proffered explanation for its actions; and (3) any
> further evidence of discrimination that may be available to the
> plaintiff, such as independent evidence of discriminatory
> statements or attitudes on the part of the employer.

*Holcomb*, 433 F.3d at 897. When assessing whether the plaintiff has met his burden to show a

pretext in a nonselection case, the court must "respect the employer's unfettered discretion to

choose among qualified candidates," *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C.

Cir. 1996), because to do otherwise "would be to render the judiciary a super-personnel

department that reexamines an entity's business decisions – a role [this circuit has] repeatedly

disclaimed." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008), quoting

*Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007); *see also Holcomb*, 433 F.3d at 897.

Here, plaintiff challenges defendant's qualifications-based explanation on two grounds.

First, he argues that O'Neill – the individual hired – was not actually qualified for the Team Lead

position because O'Neill did not meet the minimum educational requirement or the specialized

experience requirement.[10] Pl.'s Opp. at 13; Pl.'s SOF ¶¶ 1–2. And second, plaintiff claims that,

even if O'Neill met the minimum qualifications for the position, plaintiff was significantly more

---

10      There are several ways for an employee to satisfy the minimal educational requirements
for a series 510 position. They are set forth in the Team Lead job vacancy announcement. *See*
PBGC Job Vacancy Announcement, Ex. F to Pl.'s Opp. at 2–3 [Dkt. # 60-8]. The specialized
experience requirement, also set forth in the vacancy announcement, required that applicants
"have one year of specialized experience at or equivalent to the GS-13 level serving as a senior
point of contact within an organization tasked with the operation of a highly complex finance or
accounting program." *Id.* at 3.

qualified than O'Neill, so that Callahan's explanation for hiring O'Neill instead of plaintiff should be seen as a pretext for discrimination. Pl.'s Opp. at 14–16; Pl.'s SOF ¶¶ 4–5. But neither argument withstands scrutiny. *See Brady*, 520 F.3d at 495 ("If the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts.").

As an initial point, the record supports defendant's contention that O'Neill met the special experience and the minimal education requirements: he met the special experience requirement because O'Neill worked as a pension analyst for PCBG for three years,[11] *see* PBGC I All Applicant Report, Application of William O'Neill, Ex. G to Pl.'s Opp. ("O'Neill App.") at 13 [Dkt. # 60-9] (indicating that he worked as a pension analyst for three years), and there was a basis for PBGC to conclude that he met the minimal educational requirements for the Team Lead position because the minimal educational requirements for that position are the same as for any series 510 position, and O'Neill previously held a series 510 job with another institution. Pelham Dep. 23:1–17, 29:2–7, June 7, 2013, Ex. J to Pl.'s Opp. ("Pelham Dep.") [Dkt. # 60-12].

---

11      Plaintiff challenges that O'Neill had the required special experience because, to support his answer that he had the experience, O'Neill "**solely** talked about his experience as the 'Acting Branch Chief of the Review and Collection Branch within CCD,' i.e., the **position he only held for three (3) months.**" Pl.'s Opp. at 14 (citation omitted) (emphasis in original). But plaintiff misrepresents O'Neill's answer. O'Neill was not referring to his position as Acting Branch Chief to show he had the specialized knowledge; instead, the first sentence of his response demonstrates that he was talking about the three years he worked as a pension benefits analyst: "As the Acting Branch Chief of the Review and Collection Branch within CCD *I maintained my responsibilities as the senior collections analyst* . . . ." O'Neill App. at 4 (emphasis added).

Plaintiff does not contest that O'Neill previously held the series 510 position.[12]  Instead, he takes issue with the way the PBGC human resources department initially screened O'Neill's application.  Specifically, plaintiff complains that Brandy Pelham – the human resources employee that originally identified O'Neill as meeting the minimum qualifications and placed him on the GS-14 certificate of eligibles – "failed to independently verify whether Mr. O'Neill actually met the minimum educational requirement" because she only "reviewed his outdated SF-50, erroneously 'assumed' he currently held a series 510 accounting position, and did not require [O'Neill] to submit a transcript."  Pl.'s Opp. at 13; *see also* Pl.'s SOF ¶ 2.  Although plaintiff is correct that Pelham did not follow the established procedure to verify O'Neill's education, it does not follow that O'Neill therefore lacked the required education and was unqualified.  Indeed, Pelham reviewed O'Neill's prior SF-50 form and verified his compliance with the education requirement in that manner.  Pelham Dep. 23:1–17, 29:2–7.  So plaintiff cannot point to O'Neill's lack of qualifications to show that plaintiff's nonselection was merely a pretext.  O'Neill was qualified for the job.

Plaintiff's second ground for establishing pretext – that he was significantly more qualified than O'Neill – is also insufficient to enable a reasonable jury to conclude that plaintiff's nonselection was actually the result of discrimination.  For an inference of pretext to arise from a qualifications gap, the plaintiff must possess a "stark superiority of credentials," *Porter*, 606 F.3d at 816, quoting *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003), so that the qualifications gap is "great enough to be inherently indicative of discrimination."  *Adeyemi*, 525 F.3d at 1227,

---

12     Plaintiff argues that O'Neill was "demoted" from a series 510 to a series 501 because O'Neill occupied a series 501 position prior to obtaining the Team Lead job in 2009.  Pl.'s Opp. at 14; *see also* Pl.'s SOF ¶ 2.  But plaintiff does not provide any evidence that would make this change in jobs – and therefore a change in the series number that is affixed to that job – relevant to the Court's analysis in this case.

quoting *Jackson*, 496 F.3d at 707; *see also Lathram*, 336 F.3d at 1091 (finding the qualifications gap significant because "there was a wide and inexplicable gulf between the qualifications" of the two candidates). To accept anything less would be inconsistent with Title VII: "Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates." *Fischbach*, 86 F.3d at 1183; *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981) ("[T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria.").

Plaintiff has not shown that a significant qualifications gap exists in this case. First of all, plaintiff does not dispute that the Team Lead job, although open to current GS-13 employees, was a GS-14 position and that at the time Callahan hired O'Neill and declined to promote plaintiff, plaintiff was a GS-13 and O'Neill was a GS-14. *See* Pl.'s SOF; Def.'s SOF ¶¶ 64, 67; *cf. Adeyemi*, 525 F.3d at 1227 (rejecting the plaintiff's position that he was significantly more qualified than the selected applicant because plaintiff only possessed the requisite qualifications for a Level 11 position whereas the individual selected possess the qualifications for a Level 12 position). Plaintiff also does not dispute the general principle that PBGC policy allowed O'Neill to decide to interview only the individuals listed on the GS-14 certificate of eligibles while not interviewing any of the candidates – including plaintiff – on the GS-13 certificate of eligibles. *See* Pl.'s SOF; *see also* Def.'s SOF ¶ 66, quoting PBGC's Notice No. 91-27, Ex. 8 to Def.'s Mem. Plaintiff only argues that Callahan's proffered reason for the decision to not interview the GS-13 candidates – that those individuals did not have significant supervisory experience while the GS-14 candidates did – must be a pretext because supervisory experience was not explicitly required in the job vacancy announcement and because in plaintiff's view, he has more

supervisory experience than O'Neill. Pl.'s Opp. at 14–15; Pl.'s SOF ¶¶ 3–5. But the record does not support plaintiff's arguments.

Although the Team Lead job vacancy announcement does not explicitly identify supervisory experience as one of the requirements to be minimally qualified for the position, *see* PBGC Job Vacancy Announcement, Ex. F to Pl.'s Opp. [Dkt. # 60-8], it is a supervisory position. Thus, it was appropriate for the deciding official to look for supervisory experience in the applicant pool, and the fact that the experience was not explicitly mentioned does not itself support an inference of pretext. *Jackson*, 496 F.3d at 709 ("The fact that an employer based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not itself raise an inference of discrimination sufficient to overcome summary judgment."); *Tolson v. James*, 315 F. Supp. 2d 110, 118 (D.D.C. 2004) (rejecting the plaintiff's argument of pretext because the hiring officer relied on a factor not explicitly mentioned in the job vacancy announcement, especially because the plaintiff "offered no evidence to support the proposition that such experience was not the true basis for [the hiring decision]"); *cf. Adeyemi*, 525 F.3d at 1227–28 ("To be sure, as Adeyemi notes, those particular qualifications were not specifically mentioned in the vacancy announcement. But they were fairly encompassed within the announcement, which sought candidates with a broad range of computer knowledge and skills.").

And plaintiff's statements do not support a finding that he possessed significantly more supervisory experience than O'Neill in any event. *See Chavers v. Shinseki*, 667 F. Supp. 2d 116, 130 (D.D.C. 2009), quoting *Talavera v. Fore*, 648 F. Supp. 2d 118, 136 (D.D.C. 2009) ("Plaintiff's contentions are beside the point. They are based only upon 'her own self-perception of her credentials, which is irrelevant for purposes of establishing discriminatory or retaliatory

conduct.'"). As evidence of his qualifications, plaintiff proffers that, among other things, he served on many teams, organized weekly meetings, and directed audits throughout his career. Pl.'s Opp. at 15–16; Pl.'s SOF ¶ 5; *see also* PBGC I All Applicant Report, Application of Pl., Ex. N to Pl.'s Opp. ("Pl.'s App.") at 2–26 [Dkt. # 60-16]. In other words, he gained "supervisory experience" through several informal leadership roles he took on.

Plaintiff also states that O'Neill has less supervisory experience because O'Neill's most recent position involved the direct supervision of only two employees.[13] Pl.'s Opp. at 14; Pl.'s SOF ¶ 4. But plaintiff ignores several of O'Neill's other supervisory positions, including one where O'Neill served "[a]s the manager of 40+ staff members" and "was directly responsible for establishing and evaluating performance plan standards." O'Neill App. at 12. Plaintiff also ignores the distinction that all of his experience was obtained in informal settings while O'Neill's experience was obtained in a formal supervisory position. *See* Aff. of Brandy Pelham, Ex. K to Pl.'s Opp. ¶ 35 [Dkt. # 60-13] (explaining that "[t]he term 'supervisory experience' means that an applicant is on record as a supervisor. The word 'Supervisory' would generally be a part of his or her title. It means that the candidate was specifically designated as a supervisor"); *see also* Robert Callahan Tr. 21:15–20, Ex. M to Pl.'s Opp. [Dkt. # 60-15] (explaining that a key factor in

---

13 Plaintiff's claim that O'Neill misrepresented himself to make it look like he had more supervisory experience than he really did, Pl.'s Opp. at 14–15; Pl.'s SOF ¶ 4, is not borne out by the record. *See* O'Neill App. at 10–22 (indicating that O'Neill worked as a pension analyst and showing that O'Neill acknowledged that he held the Acting Branch Chief position for only three months). But even if it was, plaintiff's argument confuses this Court's inquiry. The question is not whether O'Neill in fact had significant supervisory experience, but whether Callahan honestly believed that he did. *Fischbach*, 86 F.3d at 1183 (alterations in original), quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992) ("[T]he issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers."); *see also Brown v. Small*, 437 F. Supp. 2d 125, 132–33 (D.D.C. 2006) (same). And there is no indication in the record that, even if Callahan did not review O'Neill's application as closely as plaintiff claims he should have, Callahan did not honestly believe that O'Neill possessed a significant level of valuable supervisory experience.

his decision to hire O'Neill was that O'Neill "had a number of years as a supervisor supervising a large team at the Smithsonian"). Whether one is ultimately preferable to the other is not for the Court to say, but the lack of a stark difference in plaintiff and O'Neill's qualifications alone is enough to find that Callahan's decision to favor candidates with supervisory experience does not support an inference of pretext. The Court therefore finds that defendant is entitled to summary judgment on Count I, plaintiff's disparate treatment claim.[14]

## II.     Defendant is entitled to summary judgment on Count III.

In Count III of the amended complaint, plaintiff asserts that his supervisors violated the antiretaliation provision of Title VII. Am. Compl. ¶¶ 250–55. Under that provision, "it is unlawful for an employer 'to discriminate against any of [its] employees . . . because [he or she] has made a charge . . . or participated in any manner in an investigation' of discrimination." *Solis*, 571 F.3d at 1320, quoting 42 U.S.C. § 2000e-3(a). Defendant maintains that he is entitled to judgment as a matter of law on Count III because many of plaintiff's alleged retaliatory acts do not constitute adverse actions under Title VII, and to the extent that any of them do, plaintiff has not rebutted defendant's legitimate, nonretaliatory explanations for the actions. Def.'s Mem. at 13–24. Defendant does not contest that plaintiff engaged in several protected activities from 2007 until 2009. *See supra* note 2.

Although plaintiff does not specifically itemize the retaliatory actions in his opposition to defendant's motion for summary judgment, the parties' arguments indicate that plaintiff relies on

---

[14]     For the same reasons, defendant is also entitled to summary judgment on plaintiff's claim that his nonselection for the 2009 Team Lead position was the result of unlawful retaliation in violation of Title VII. *See Porter*, 606 F.3d at 815 (analyzing together the claims that the plaintiff was not selected for a position because of discrimination and retaliation). Plaintiff proffered no evidence to show that defendant's legitimate, nonretaliatory explanation for Callahan's decision to hire O'Neill instead of plaintiff was a pretext for retaliation.

the same laundry list of actions that he put forth in support of his discrimination claim in order to show that he suffered adverse actions in retaliation for his protected activity:

- the allegedly unreasonable deadline for the completion of the ATB project;

- the requirement to provide daily progress reports while working on the ATB project;

- the "unreasonable" deadline for the completion of the High Dollar Credit Review Project;

- the requirement to provide weekly updates while working on the High Dollar Credit Review Project;

- the "unreasonable" deadline to complete a "credit balance review assignment;"

- being excluded from participation in the Premium and Practitioners System User Acceptance Test Plan ("UAT program");

- being prevented from receiving assistance from his designated EEO representative in furtherance of his EEO complaints;

- being denied the opportunity to participate in the USDA Leadership program; and

- the lower overall performance rating of "Meets Expectations" in the FY 2009 performance appraisal.[15]

_____

15    At some point, plaintiff also asserted that Callahan retaliated against him when he was denied the opportunity to participate in the drafting of a CCD manual. *See* Def.'s Mem. at 18. Defendant contests that claim, stating that plaintiff was in fact permitted to participate and that, as a result of that participation, Callahan recommended that plaintiff receive an award of time off for his contribution. *Id.* at 20; Def.'s SOF ¶¶ 48–49; Decl. of Robert Callahan ("Callahan Decl.") ¶¶ 19–20 [Dkt. # 58-3]; Attach. 7 to Callahan Decl. [Dkt. # 58-3]; Attach. 8 to Callahan Decl. [Dkt. # 58-3]. Plaintiff did not respond to defendant's statements in his opposition or in his statement of material facts that are in dispute. As a result, the Court finds that defendant is entitled to summary judgment on plaintiff's claim that Callahan violated Title VII's antiretaliation provision in connection with the CCD manual project.

Plaintiff also asserts Callahan retaliated against him when Callahan denied plaintiff's request for advanced sick leave.[16]  *See* Pl.'s Opp. at 6.

Although the Court concluded above that many of these actions do not constitute adverse actions for purposes of establishing a disparate treatment discrimination claim, the Court must repeat that analysis in the retaliation context because what constitutes an adverse action under Title VII's antiretaliation provision is different than what constitutes an adverse action under the antidiscrimination provision.  *Burlington Northern*, 548 U.S. at 57; *Steele*, 535 F.3d at 695–96. Unlike in the discrimination context, the "scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm," *Burlington Northern*, 548 U.S. at 67, and therefore, it does not require a materially adverse change in the terms and conditions of employment.  *Steele*, 535 F.3d at 695–96; *see also Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 150–51 (D.D.C. 2013), quoting *Bridgeforth v. Jewell*, 721 F.3d 661, 664 n.* (D.C. Cir. 2013) (explaining that "retaliation 'emcompass[es] a broader sweep of actions' than wrongful discrimination").

But the concept is not unlimited, and actionable retaliation still does not include trivial harms:  "Actionable retaliation claims are limited to those where an employer causes '*material adversity*,'" and the plaintiff still must suffer some objectively tangible harm.  *Wiley v.*

---

16    In his opposition, plaintiff intimates that he was retaliated against when PBGC's human resources department allegedly interfered with plaintiff's worker's compensation request.  Pl.'s Opp. at 5–6.  But, not only does he fail to provide any evidence to support that the alleged interference was a product of retaliation, plaintiff barely provides this Court with an account of what actually transpired.  And plaintiff previously informed this Court that he was not asserting the alleged interference of his worker's compensation claim as an adverse action on which to premise his retaliation claim, but instead raised it as background evidence of what was going on in his office.  *Morales*, No. 10-cv-221, slip op. at 24 n.4.  As a result, the Court finds that plaintiff has failed to meet his burden and, to the extent plaintiff intends to assert the alleged interference with his worker's compensations claim as evidence of retaliation, defendant is entitled to summary judgment on that claim.

*Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007); *Allen v. Napolitano*, 774 F. Supp. 2d 186, 199 (D.D.C. 2011), quoting *Holcomb*, 433 F.3d at 902. The Supreme Court has defined material adversity in the retaliation context as an action that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern*, 548 U.S. at 68, quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006). It is an objective standard that is phrased "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 69.

Should a court determine that a plaintiff has demonstrated that an alleged retaliatory act constitutes an adverse action under Title VII, then it is to apply the *McDonnell-Douglas* burden-shifting framework. *Bernanke*, 557 F.3d at 677. As in the discrimination context, a court need not address the threshold issue of whether plaintiff established his prima facie case once defendant has asserted a legitimate, nonretaliatory reason for the adverse action. *Id.* at 678, citing *Brady*, 520 F.3d at 494. Plaintiff must then satisfy his burden to establish an inference of pretext, and he can only survive summary judgment if he also provides sufficient evidence to show that retaliation was the "but-for cause" of the alleged adverse actions. *Nassar*, 133 S. Ct. at 2533.

### A. Defendant is entitled to summary judgment on plaintiff's claim that the project deadlines and reporting requirements violated Title VII's antiretaliation section.

Plaintiff argues that his supervisors retaliated against him on three separate occasions by imposing what he believed were unreasonable project deadlines: in May 2008, Mathes instructed plaintiff to complete the ATB project in two weeks; in October 2009, O'Neill told plaintiff to complete the High Dollar Credit Review project in three weeks; and in November 2009, Callahan asked plaintiff to complete the credit balance review project in one day. Pl.'s Opp. at 3, 7–8; Pl.'s SOF ¶¶ 6, 12, 14. Plaintiff also claims that his supervisors further retaliated

against him on two occasion by compounding the deadlines with unnecessary reporting requirements: in May 2008, Mathes asked plaintiff to provide her with daily updates of his work activities, and in October 2009, O'Neill asked plaintiff to provide him with weekly updates on the High Dollar Credit Review project. Pl.'s Opp. at 3, 7–8; Pl.'s SOF ¶¶ 7, 13. But plaintiff has failed to demonstrate that any of those five allegedly retaliatory actions constitute an adverse action under Title VII. Moreover, to the extent that those actions can be considered to be materially adverse, plaintiff has failed to rebut defendant's legitimate, nonretaliatory explanation and to establish that retaliation was the but-for cause of his supervisors' decisions.

As this Court previously recognized when ruling on defendant's motion to dismiss, burdening an employee with retaliatory work assignments can constitute a materially adverse action. *See Burlington Northern*, 548 U.S. at 70–71 ("Common sense suggests that one good way to discourage an employee . . . from bringing discrimination charges would be to insist that []he spend more time performing the more arduous duties and less time performing those that are easier or more agreeable."). This is particularly true where the employer "frequently tighten[s] deadlines and greatly increase[es] an employee's workload." *Allen*, 774 F. Supp. 2d at 203; *see also Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010) (finding a materially adverse action when the employer increased the plaintiff's "workload to five to six times that of other employees" and indicated that it was "doing so 'to keep [the plaintiff] too busy to file complaints'"). But where the shortened deadlines or increased workload occur infrequently, another court in this district has found that the employer's conduct did not amount to a sufficiently adverse action to sustain a retaliation claim: "It is not out of the ordinary for an employee to have been expected to shoulder an extra load on occasion over a two-year span, or to have been asked to step in if there were unexpected staff shortages." *Brodetski v. Duffey*, 141

F. Supp. 2d 35, 45 (D.D.C. 2001). Put differently, the shortened deadlines or increased work must be frequent or particularly onerous to be material; otherwise they are *de minimis* and "trivial."

Assessing the alleged unreasonable deadlines and reporting requirements in this case against that backdrop, while also viewing them "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" *Burlington Northern*, 548 U.S. at 71, quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), the Court finds that they do not amount to materially adverse actions. Although the deadlines and reporting requirements placed plaintiff under some pressure and induced some stress – particularly when in May 2008 he was also covering for co-workers who were out of the office – this is not a case where plaintiff was frequently or permanently subjected to unduly burdensome or arduous assignments.[17] *See Burlington Northern*, 548 U.S. at 71 (involving permanent reassignment to less favorable work duties); *Mogenhan*, 613 F.3d at 199 (involving an increased workload of five to six times the workload of other employees). Instead, plaintiff experienced three instances over the course of almost a year and half in which his supervisors asked him to complete projects in less time than he considered appropriate, and he experienced two instances where his supervisors asked for frequent status updates. Indeed, the Court is hard-pressed to conclude that plaintiff was unreasonably burdened by these requirements since, according to his own testimony, in at least one of the situations he simply ignored them and was not sanctioned for his noncompliance. *See* Dep. of Paul Morales ("Morales Dep."), Ex. O to Pl.'s Opp. 75:16–22 [Dkt. # 60-17] (stating that he did not comply with the request for daily reports); *see also Burlington Northern*, 548 U.S.

---

17      Moreover, with respect to the ATB project, this is not a situation where the extra assignment "buried" plaintiff in work. In an email to Mathes, plaintiff acknowledges that he "anticipate[d] very little if any daily work on this project through May." Ex. 2 to Def.'s Mem. at 139 [Dkt. # 58-4].

at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").  This infrequent imposition of demanding goals[18] and increased oversight is unlikely to prevent a reasonable employee from engaging in protected activity and therefore does not amount to a materially adverse action.  *See Burlington Northern*, 548 U.S. at 68 ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms."); *Solis*, 571 F.3d at 1321, quoting *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002) (finding the requirement that an employee provide bi-weekly updates on the status of her work amounted to nothing more than a "minor 'inconvenience[] and alteration of job responsibilities'" and therefore did "'not rise to the level of adverse action' necessary to support a [retaliation] claim"); *Allen*, 774 F. Supp. 2d at 203 (finding no adverse action because the plaintiff only "alleged that there were a few instances when she received same-day requests and could have benefitted from additional resources and support"); *Brodetski*, 141 F. Supp. 2d at 45.  As the Supreme Court has explained, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  *Burlington Northern*, 548 U.S. at 68.

But even if the project deadlines amounted to materially adverse actions, plaintiff has not met his burden to show that they were solely the product of retaliation, which also entitles defendant to summary judgment.  *See Nassar*, 133 S. Ct. at 2533.  As an initial point, plaintiff does not dispute that his supervisors did not impose consequences for his failure to complete, let alone work on, the ATB project within the two week period or to provide status updates to

_____

18      The record also indicates that the High Dollar Credit Review project did not even have a hard "deadline."  In an email sent by O'Neill to plaintiff that summarizes the assignment, O'Neill indicated that "[t]he *target date* for completing the review of 'high dollar' is 10/31/09." O'Neill Email at 24.

Mathes.[19]  Pl.'s Opp.; Pl.'s SOF; *see also* Def.'s Mem. at 12; Def.'s SOF ¶¶ 36–37.  Imposing "unreasonable" requirements but not subsequent consequences is not likely to be indicative of retaliatory intent.

But more importantly, plaintiff does little to rebut defendant's legitimate, nonretaliatory explanation for the supervisors' conduct.  With respect to the project deadlines, defendant asserts that the projects were legitimate assignments within plaintiff's expertise and that the supervisors honestly believed the deadlines were reasonable.  Def.'s Mem. at 14–18; *see* Def.'s SOF ¶¶ 29–37.  Plaintiff does not dispute the first part:  when asked whether one of the assignments – the ATB project – was a legitimate assignment, he responded:  "It was a very legitimate assignment."  Morales Dep. 73:4–5.  And plaintiff cannot tie the imposition of the deadlines he complains about to any retaliatory animus.  Instead, he simply alleges that his supervisors knew that he had engaged in protected activity and that, in his personal opinion, the deadlines imposed were unreasonable.  Pl.'s SOF ¶¶ 6, 8–12, 14.  This is not sufficient to create even a reasonable inference of pretext, let alone to satisfy *Nassar*'s but-for causation requirement.

First, plaintiff cannot rely solely on his own statements that the deadlines imposed were unreasonable in order to support an inference of pretext.[20]  *See Ginger*, 527 F.3d at 1346 (rejecting summarily the plaintiffs' alleged retaliatory actions that had no documentary support);

---

19     Plaintiff also makes contradictory statements about whether he asked for help with the ATB project.  In his statement of material facts, he asserts that he requested help but did not receive it.  Pl.'s SOF ¶ 8.  But in his deposition, when plaintiff was asked whether he ever took Mathes up on her offer to provide him with assistance on the ATB project, he responded:  "For all I know, I said yes."  Morales Dep. 75:5–6.

20     And even if he could, plaintiff's assertions – at least with respect to Mathes – are undercut by his own witnesses.  *See* Aff. of Richard Anderson ("Anderson Aff."), Ex. 1 to Pl.'s Opp. ¶ 13 [Dkt. # 31-2] ("Concerning [plaintiff's] claim that management subjected him to unrealistic deadlines and pressures, that is Ms. Mathes' normal style.  She gave me projects with unrealistic turnaround times.").

*Mianulli v. Potter*, 634 F. Supp. 2d 90, 97 (D.D.C. 2009) (rejecting a disparate treatment discrimination claim because the plaintiff "offered no evidence . . . to support the self-serving and conclusory allegation that the deadlines were in fact unreasonable or that the deadlines were a result of his race or color"). Second, plaintiff's own deposition testimony cuts against the conclusion that the inadequate timelines were imposed solely because his supervisors wished to retaliate against him; plaintiff took the position that his supervisors were simply uninformed: "Again, the majority of the managers in CCD had no idea of what was being done, *the time lengths to accomplish tasks* or handling customer inquiries or the issues. They just didn't know. They didn't want to know." Morales Dep. 56:8–11 (emphasis added). And third, plaintiff has provided the Court with no evidence from which it can infer that these projects and their deadlines would not have been imposed but for plaintiff's participation in protected activity. In fact, plaintiff admits that factors other than retaliation could explain his supervisors' decisions: "The arbitrary and impossible deadlines indicate *either* a lack of knowledge by Mr. Callahan and Mr. O'Neill, or it is purposeful so as to set me up for failure and give management a reason to discipline me." Aff. of Paul Morales ("June 21, 2010 Morales Aff."), Ex. T to Pl.'s Opp. ¶ 117 [Dkt. # 60-22] (emphasis added). As a result, plaintiff has not met his burden, and defendant is entitled to summary judgment on plaintiff's claims that his supervisors retaliated against him by setting unreasonable deadlines.

Similarly, plaintiff has not established an inference of pretext or but-for causation with respect to his claim that his supervisors imposed unreasonable reporting requirements to retaliate against him. Defendant claims that the reporting requirements serve the legitimate, nonretaliatory purpose of permitting a supervisor to ensure that his or her subordinate's work is

completed.[21]  *See* Def.'s Reply to Pl.'s Opp. ("Def.'s Reply") at 12 [Dkt. # 63]; Sherry Mathes

Tr. ("Mathes Tr.") 60:12–14, Feb. 25, 2013, Ex. C to Pl.'s Opp. [Dkt. # 60-5] (explaining why

she asked for a daily report on plaintiff's activities:  "I just figured if he wasn't getting it done, I

would like to know what he was doing that was preventing him from getting it done").

Plaintiff's sole argument in rebuttal is that he has never before been required to provide frequent

updates and that he is unaware of any other PBGC accountant who has had to provide those

types of updates.  Pl.'s SOF ¶¶ 7, 13.  But that argument does not support a finding of pretext.

With respect to the reporting requirement imposed by Mathes, plaintiff's assertion that no

other PBGC employee has had to provide daily reports is contradicted by the evidence he

presented to the EEOC.  Sonia Bermudez – one of plaintiff's colleagues – stated in an affidavit

during the EEO investigation that Ms. Mathes had initially required daily reports from those

assigned to her team.[22]  Aff. of Sonia Bermudez, Ex. 5 to Pl.'s Opp. ¶ 24 [Dkt. # 31–6].

Furthermore, the record demonstrates that Mathes imposed the requirement only *after*

plaintiff indicated to her that he was not going to be able to complete the project within the two

week time frame.  Mathes Tr. 59:2–6.  Plaintiff makes no attempt to address the circumstances

that prompted the supervisor's request to be kept apprised of his progress, so his self-serving

comparisons to his own prior experience or his co-worker's experience does little to meet his

burden of proof.  *See Baloch*, 550 F.3d 1200–01 (noting that the plaintiff's comparison to his

---

21      Defendant did not assert a legitimate, nonretaliatory reason for O'Neill's decision to ask
plaintiff to provide him with weekly updates and instead argues that plaintiff abandoned this
claim because he did not address it in his opposition.  *See* Def.'s Reply at 17.  While defendant is
technically correct, plaintiff did contest the legitimacy of the reporting requirement in his
statement of material facts that are in dispute.  *See* Pl.'s SOF ¶ 13.  Accordingly, the Court will
consider the claim but, for the reasons stated below, finds that plaintiff nonetheless failed to meet
his burden to survive the summary judgment stage.

22      There is no indication that Mathes imposed the reporting requirement in order to retaliate
against the employees assigned to her team.

colleague could not support an inference of retaliation because the colleague "was not similarly situated").

Plaintiff also fails to point to evidence that supports an inference of retaliation with respect O'Neill's request for weekly updates. The High Dollar Credit Review project was the first project that plaintiff had ever worked on for O'Neill, and plaintiff offers no evidence other than his own beliefs that O'Neill never imposed a reporting requirement on anyone else. And even if plaintiff was the only employee who was asked to keep O'Neill so informed, plaintiff does not demonstrate any causal link between the imposition of that requirement and his involvement in protected activities. Plaintiff's final protected activity occurred in March 2009, which was almost seven months before O'Neill asked him to provide the updates, and therefore, there is no basis to draw an inference of causation based on temporal proximity.[23] *See McIntyre*, 460 F. Supp. 2d at 133 (noting that courts in this district "often follow[] a three-month rule to establish causation on the basis of temporal proximity alone"); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citation omitted) (noting that "temporal proximity must be 'very close'"). And there is nothing else offered to support an inference that, but for plaintiff's involvement in protected activity, O'Neill would not have required plaintiff to provide

---

[23]     Although defendant argues that O'Neill did not know about plaintiff's protected activity in October 2009 and plaintiff makes no attempt to rebut that argument, the case law in this Circuit instructs that, at the summary judgment stage, a supervisor's knowledge of protected activity can be inferred from the employer's knowledge of that activity. *See Bernanke*, 557 F.3d at 679. Thus, the Court can infer that O'Neill knew about plaintiff's actions based on PBGC's awareness of plaintiff's EEO complaint, and plaintiff's final protected activity – his March 2009 amendment of his EEO complaint – serves as the point from which the Court measures temporal proximity. *See Bernanke*, 557 F.3d at 680 ("[W]e have repeatedly held that an adverse action following closely on the heels of protected activity may in appropriate cases support an inference of retaliation even when occurring years after the initial filing of charges.").

him with weekly updates.  Defendant is therefore is entitled to summary judgment on plaintiff's claim that the reporting requirements violated Title VII's antiretaliation provision.[24]

**B. Defendant is entitled to summary judgment on plaintiff's claim that Callahan's decisions to not select plaintiff for participation in the UAT program and the USDA Leadership program violated Title VII's antiretaliation section.**

Plaintiff also contends that Callahan retaliated against him in violation of Title VII when Callahan did not select plaintiff for participation in the UAT program and denied plaintiff's request to attend the USDA Leadership program.  Pl.'s SOF ¶¶ 11, 15–16.  Neither action amounts to an adverse action under Title VII.

Other courts in this district have continuously held that the "denial of training opportunities is only actionable if there is a resultant 'material change in . . . employment conditions, status, or benefits,'" *Dorns v. Geithner*, 692 F. Supp. 2d 119, 133 (D.D.C. 2010) (alteration in original), quoting *Lester v. Natsios*, 290 F. Supp. 2d 11, 29 (D.D.C. 2003), that results "in a tangible harm."  *Id.*, quoting *Everson v. Medlantic Healthcare Grp.*, 414 F. Supp. 2d 77, 84 (D.D.C. 2006); *see also Warner*, 956 F. Supp. 2d at 171; *Allen*, 774 F. Supp. 2d at 204.  As a result, "the denial of a . . . training opportunity must have a discernible, as opposed to a speculative, effect on the terms, conditions, or privileges of one's employment," and therefore, "the denial of training opportunities and committee assignments outside of, or in addition to, an employee's job responsibilities does not generally constitute an adverse employment decision."

---

24      The parties both dedicate a large portion of their retaliation sections to the question of whether the supervisor's had the requisite knowledge at the appropriate times in order to support a finding of causation.  Although there appears to be a genuine dispute among the parties with respect to the knowledge issue, the Court finds that it does not create the *material* dispute needed to prevent summary judgment because, even accepting that the supervisors had knowledge of plaintiff's protected activities before imposing the deadlines or reporting requirements, plaintiff still has not met its burden to establish that they amounted to adverse actions or that retaliation was the but-for cause of their implementation.

*Warner*, 956 F. Supp. 2d at 171; *see also Allen*, 774 F. Supp. 2d at 204; *Dorns*, 692 F. Supp. 2d at 133.

Plaintiff provides the Court with no evidence to show that his nonselection for participation in the UAT program or Callahan's denial of plaintiff's request for training funds to attend the USDA Leadership program had a discernable effect on the terms, conditions, or privileges of his employment. In fact, nowhere in his opposition to the motion for summary judgment, his statement of material facts, his exhibits attached to his opposition, or even his exhibits attached to his opposition to defendant's prior motion to dismiss does plaintiff make any attempt to demonstrate that he suffered a tangible harm from not participating in the UAT program. Defendant is therefore entitled to summary judgment on plaintiff's claim that Callahan retaliated against him by not selecting plaintiff to participate in the UAT program. *See Dorn*, 692 F. Supp. 2d at 133 ("[P]laintiff has failed to demonstrate that the denial of her training request produced any adverse consequences in her employment status, condition, or benefits, and therefore this component of her discrimination and retaliation claim fails.").

Similarly, plaintiff does not support his contention that Callahan's denial of his request for training funds to attend the USDA Leadership program amounted to an adverse action under Title VII. In his statement of material facts, plaintiff "maintains that, had he been permitted to participate in the USDA Leadership program, he would have gained additional managerial experience and therefore advanced his career within CCD." Pl.'s SOF ¶ 16. But that claim is speculative, especially considering that the selecting official in the most recent leadership position plaintiff had applied for was focusing "on the actual jobs held by the candidates, rather than committees on which they served or cross-training they received." *Warner*, 956 F. Supp. 2d at 171. Moreover, the statements in plaintiff's own declaration undercut his position that

Callahan's decision not to fund his participation in the USDA Leadership program had a material effect on his ability to perform his job responsibilities as an accountant at PBGC. When asked why he believed the USDA training "would have been appropriate to your current duties," plaintiff answered:

> Well, because one thing that was supposed to do is we were supposed to be outside of the agency for about a year and we would undergo special training. It wasn't about management totally. It was about working in other federal agencies, learning what they do and writing reports. . . . The other thing to think about was given the stress, given everything that was happening in PBGC, I mean, for $5,000, they could have sent me off for a year and we certainly could have had that distance we needed . . . . [T]hey were telling us that those who went into the program probably would not be around their agency very much for a year . . . .

Morales Dep. 127:21–128:2, 128:15–19, 128:23–25. Although it might be useful to learn how other agencies operate, and plaintiff may have correctly viewed the opportunity as a productive "time out" from a difficult work environment, there is nothing about this testimony that demonstrates that exclusion from the USDA Leadership program produced a material change in plaintiff's employment condition, status, or benefits. Therefore, it did not amount to a material adverse action.

But even if keeping plaintiff from the UAT program or the USDA Leadership program did amount to an adverse action, plaintiff has not met his burden to show that defendant's legitimate, nonretaliatory reasons for those decisions are pretextual or that retaliation was the but-for cause of those actions. Defendant states that plaintiff was not selected to participate in the UAT program because the program was scheduled to take place during October/November, one of CCD's peak periods for refund approvals, and therefore "Mr. Morales' services were required for performance of those refund approvals . . . rather than UAT duties." Decl. of Robert Callahan ("Callahan Decl."), Ex. 1 to Def.'s Mem. ¶ 6 [Dkt. # 58-3]; Def.'s SOF ¶¶ 44–46.

Plaintiff attempts to rebut that explanation by stating that the it "lacks merit because Mr. Callahan made the decision to exclude plaintiff from said Plan in mid-2007, several months prior to the November peak period of refund activity." Pl.'s SOF ¶ 15. But that fact does not cast doubt on the legitimacy of the explanation, even if, as plaintiff contends, the decision was made before the date the program was pushed back to take place in November. The previous schedule had the UAT program occurring during the month of October, which is undisputedly a peak period for CCD. *See* Callahan Decl. ¶ 5; Def.'s SOF ¶¶ 44–46.

And with respect to the USDA Leadership program, defendant asserts that Callahan denied the request for training funds because the cost of the program exceeded the remaining training funds available for that fiscal year, the fee would have exhausted close to the entire training budget for all CCD employees, and PBGC was in the process of developing its own leadership program. Def.'s Mem. at 23–24; Def.'s SOF ¶¶ 51–53; Callahan Decl. ¶¶ 13–17; Attach. 4 to Callahan Decl. [Dkt. # 58-3]. Plaintiff attempts to rebut this legitimate, nonretaliatory reason based on his own belief that the agency could have made money available to him if it wanted to and that the PBGC leadership program was not available at that time. Pl.'s SOF ¶ 16. But the testimony does not support his contention, *see* Callahan Decl. ¶ 17 ("I have never approved any training request by any single CCD employee that exceeded the funds available in the CCD training budget."), and plaintiff's personal beliefs alone are not sufficient to carry his burden to demonstrate pretext or to support but-for causation. *See Forkkio*, 306 F.3d at 1131 (internal citation and quotation marks omitted) ("Forkkio failed to provide any evidence, beyond his conclusory assertions of loss of prestige, of any adverse consequence to his position or future career . . . ."). Defendant is thus entitled to summary judgment on plaintiff's claim that

his exclusion from the UAT program and the USDA Leadership program violated the antiretaliation provision of Title VII.

**C. Defendant is entitled to summary judgment on plaintiff's claim that Callahan's decision to not allow plaintiff's EEO representative to assist him on two days in January 2009 violated Title VII's antiretaliation section.**

Plaintiff next alleges that Callahan retaliated against him when Callahan denied Richard Anderson's request for official time to help plaintiff prepare his EEO complaint on January 15, 2009, and then again on January 22, 2009. Pl.'s Opp. at 5, 18. Defendant argues that he is entitled to summary judgment on this claim because denial of a third party's request for official time does not amount to an adverse action against the plaintiff.[25] Def.'s Reply at 9. But resolution of this question is not as simple as defendant suggests. Although it was Anderson who made the request for official time, he did so on behalf of plaintiff and with the goal of assisting plaintiff in drafting his EEO complaint. It is not beyond the realm of possibility that in some situations, a supervisor who wishes to retaliate against an individual would do so by denying that individual access to his or her official EEO representative. It is also not hard to imagine that such a denial might, in some circumstances, effectively chill a reasonable employee's decision or ability to engage in protected activity. But the Court need not determine whether this is one of those situations.

Even assuming that the refusal to permit Anderson to take official time to assist plaintiff on those two days is actionable, plaintiff has failed to rebut the legitimate, nonretaliatory explanation for that decision. Defendant explains that Callahan denied Anderson's request

---

[25] Defendant also argues that the Court already found that denial of access to plaintiff's EEO representative did not amount to an adverse action under Title VII. But the Court did not make that finding. Instead, in ruling on defendant's motion to dismiss Count III, the Court found only that some of plaintiff's alleged retaliatory acts might arise to the level of adverse action and that he therefore survived the Rule 12(b)(6) motion. *Morales*, No. 10-cv-221, slip op. at 22–24.

because, at that time, Anderson was already assisting other employees with their EEO complaints, he had just returned from vacation, CCD was short two accountants, and the agency was about to enter the February peak filing period. Def.'s Reply at 9–10; Callahan Decl. ¶ 18; Attach. 6 to Callahan Decl. [Dkt. # 58-3]; Callahan Tr. 42:3–7. Plaintiff does not dispute the accuracy of any of those reasons. Instead, he argues that defendant's explanation is pretextual because, at that time, Callahan allowed Anderson to assist Callahan's wife with her EEO complaint. *See* June 21, 2010 Morales Aff. ¶ 74. But that is insufficient to carry plaintiff's burden.

Anderson himself previously testified that Mr. Callahan's decision to deny his request for official time in January 2009 "was correct." Anderson Aff. ¶ 19. Moreover, while it is unclear from plaintiff's filings when Anderson was permitted to assist Callahan's wife – in his July 6, 2009 Supplemental Affidavit, plaintiff asserts that Anderson assisted Callahan's wife in October 2008, *see* July 6, 2009 Supp. Aff. of Paul Morales, Ex. U to Pl.'s Opp. ¶ 8 [Dkt. # 60-23], but in his June 21, 2010 Affidavit, he places the date in January 2009, *see* June 21, 2010 Morales Aff. ¶ 74 – that fact is insufficient to carry plaintiff's burden to establish an inference of pretext or but-for causation. If Anderson assisted Callahan's wife in October 2008, plaintiff has offered no evidence to demonstrate that the same workload concerns were present at that time. And if Anderson assisted Callahan's wife in January 2009, plaintiff's point actually confirms one of the reasons that Callahan denied Anderson's request to help plaintiff: that Anderson was *already* helping other employees. An inference of retaliation does not arise in either case. If anything, plaintiff's complaint that Callahan permitted Anderson to help his wife but not plaintiff gives rise to an inference that Callahan may have shown favoritism or made an exception for his wife, not that he retaliated against plaintiff. Thus, the Court finds that plaintiff has not carried his burden

to establish retaliation as the motivation behind the challenged action, and defendant is entitled to summary judgment on plaintiff's claim that Callahan's denial of Anderson's request for official time to assist plaintiff in drafting his EEO complaint was retaliatory.

**D. Defendant is entitled to summary judgment on plaintiff's claim that his lowered performance evaluation in 2009 violated Title VII's antiretaliation section.[26]**

Plaintiff has also not met his burden to demonstrate that his performance evaluation in 2009 can be the basis for a claim for retaliation. It is well-settled in this Circuit that, "[i]n order for a performance evaluation to be materially adverse, it must affect the employee's 'position, grade level, salary, or promotion opportunities.'" *Solis*, 571 F.3d at 1321, quoting *Baloch*, 550 F.3d at 1199; *see also Porter*, 606 F.3d at 818; *Dorns*, 692 F. Supp. 2d at 132 (alterations in original), quoting *Brown*, 199 F.3d at 458 ("There is a 'thick body of precedent [that] . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions."). This requirement reflects that "[e]valuations may change over time due to a variety of reasons;" this is "a reality of the workplace and, consequently, a more negative evaluation

---

26      In addition to asserting that PBGC retaliated against him by lowering his performance evaluation, plaintiff originally argued that the 2009 change to his performance evaluation standards was a retaliatory act. Pl.'s Opp. at 6, 22. But plaintiff's most recent actions suggest that he has abandoned that position. He provides no argument or evidence in his opposition or statement of facts that the change was an adverse action or that it was done for a retaliatory purpose. Moreover, plaintiff expressly disclaims that the change in the employee appraisal process was retaliatory in his deposition:

> Q: Mr. Morales, did you believe that the modification of the employee performance appraisal process was retaliatory towards you?
>
> A: No. I've stated that it was a violation of the CBA, the collective bargaining agreement.

Morales Dep. 158:7–11. But to the extent that plaintiff does base his retaliation claim on the 2009 change in the employee performance standards, it fails for the same reasons as his claim that his 2009 lower performance evaluation was the product of retaliation.

compared to a prior evaluation is simply not sufficient, standing alone, to establish discrimination, retaliation, or pretext." *Warner*, 956 F. Supp. 2d at 162.

Plaintiff does not allege that he suffered a tangible harm of that kind and therefore has not shown that the lower performance evaluation in 2009 amounted to a material adverse action. *See Solis*, 571 F.3d at 1321 (alteration in original) (internal citation and quotation marks omitted) ("Taylor's bare, conclusory allegation that she was denied promotional and bonus opportunities [a]s a result of PBGC's unlawful conduct in violating Title VII's prohibition against retaliation does not discharge her burden to show the evaluations were attached to financial harms."); *Baloch*, 550 F.3d at 1199 ("Baloch did not produce evidence showing that the 2003 negative performance evaluation could affect his position, grade level, salary, or promotion opportunities."); *Warner*, 956 F. Supp. 2d at 162 ("[P]laintiff cannot rely solely on her slightly lower performance evaluations of 'excellent' rather than 'outstanding' to support her claim.").

Moreover, even if plaintiff had alleged some tangible harm sufficient to demonstrate that his 2009 performance evaluation of "meets expectations" was adverse, he has failed to rebut defendant's legitimate, nonretaliatory explanation for the evaluation:  that it was supported by the narrative and comments on the evaluation form.  Def.'s Mem. at 21–23; Def.'s Reply at 12–13; Def.'s SOF ¶¶ 58–60.  Nor has he shown that retaliation was the but-for cause of the decline. Plaintiff does not even dispute the accuracy of the comments that prompted the lower assessment.  Instead, he reasserts his belief that his supervisors gave him assignments with unreasonable deadlines and that they subjected his work to greater scrutiny than that of his co-workers while providing no testimony or documentary evidence as support for those conclusions. Pl.'s SOF ¶ 17.  Plaintiff also makes no attempt to demonstrate that the comments that supported his lowered performance evaluation – that he "(i) timely submitted a write-off report only eight

out of the twelve months, (ii) did not provide notated account histories, (iii) failed to properly document 18 customer communications, and (iv) generated no documentation demonstrated that he had resolved canceled or returned refunds," Def.'s SOF ¶ 60 – even relate to the projects with the allegedly unreasonable deadlines.  And the Court has already concluded that plaintiff has not shown the deadlines to be retaliatory.  Plaintiff therefore has not met his burden, and defendant is entitled to summary judgment on plaintiff's claim that his supervisors violated Title VII when it gave him a lower performance evaluation in 2009.[27]

### E. Defendant is entitled to summary judgment on plaintiff's claim that Callahan's decision to deny plaintiff's request for advanced sick leave violated Title VII's antiretaliation section.

The last alleged retaliatory action that plaintiff points to in support of his Title VII retaliation claim is based on Callahan's denial of plaintiff's request for advanced sick leave in February 2009.  Pl.'s Opp. at 22.  But, as in the case of the other alleged retaliatory actions above, plaintiff has not met his burden of proof at the summary judgment stage.

First, plaintiff has not established that the denial of his advanced sick leave request was an adverse action under Title VII.  Although some courts in this district have found a denial of advanced sick leave to be an adverse action, those cases involved either a significant period of time – three to four weeks of sick leave, *Childs-Pierce v. Utility Workers Union of Am.*, 383 F. Supp. 2d 60, 65, 75 (D.D.C. 2005) – or a showing of financial harm from the denial.  *Diggs v. Potter*, 700 F. Supp. 2d 20, 43 (D.D.C. 2010).  Here, plaintiff has not suggested that he experienced a financial harm from the denial of his request, which weakens his assertion that the denial was an adverse action.  *See id.* at 41.  But even if he did demonstrate that he experienced a

---

27   In the amended complaint, plaintiff mentions that his performance evaluation eventually dropped to "unacceptable."  Am. Compl. ¶ 181.  But he does not mention that rating in connection with the summary judgment motion.  The Court will therefore treat it as abandoned.

financial loss as a result of the denial, that adverse action does not rise to the level of being *material*: the denied request was for only one day of sick leave and was therefore *de minimis*. *See Dorns*, 692 F. Supp. 2d at 133, quoting *Rochon*, 438 F.3d at 1219 (explaining that, "assuming that the denial of advanced sick leave is actionable, the amount in question here" – three days – "is too *de minimis* to be considered 'material' or 'significant'").

And, even if the Court were to find that the denial of sick leave was an adverse action, plaintiff has not met his burden to rebut defendant's legitimate, nonretaliatory explanation for that decision or to show but-for causation. Defendant explains that PBGC's policy states that advanced sick leave is not available unless an individual plans to take three consecutive days, and that plaintiff therefore did not qualify for that type of leave because he requested only one day. Def.'s Reply at 8–9. Plaintiff makes no attempt in his opposition to rebut this explanation; instead, in the amended complaint, he claimed that it was within Callahan's discretion to decide whether to give him advanced sick leave for only one day, but he provided no documentary evidence to support that contention. Am. Compl. ¶¶ 117, 120. He simply pointed to another occasion, a month later, when he requested to be put on the flexiplace program and Callahan instead granted him three hours of advanced sick leave. *Id.* ¶ 120. Whether this is enough to create an inference of pretext is questionable, but it does not establish but-for causation. In fact, Callahan's willingness to accommodate plaintiff one month later weakens the inference that retaliation was the but-for cause of Callahan's decision to deny the February 2009 request. Thus, defendant is entitled to summary judgment on plaintiff's claim that Callahan's decision to deny his request for advanced sick leave violated Title VII's antiretaliation provision.

## CONCLUSION

Because plaintiff has failed to meet his burden in support of his disparate treatment and retaliation claims and because none of the facts that plaintiff claims are in dispute are material to the outcome of this case, the Court finds that defendant is entitled to judgment as a matter of law on Counts I and III. The Court will therefore grant defendant's motion for summary judgment. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: May 19, 2014